F IL E D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 JAN 27  PM 2: 34

U.S. DISTRICT COURT
N.D. OF ALABAMA

DANNY JOE BRADLEY,              )
                               )
        Petitioner,            )
                               )
v.                             )        CASE NO. 93-B-0958-S
                               )
JOHN E. NAGLE, Warden;         )
ATTORNEY GENERAL FOR           )
THE STATE OF ALABAMA           )        ENTERED
                               )
        Respondents.           )        JAN 27 1999

## MEMORANDUM OPINION

Danny Joe Bradley, an inmate in the custody of the Department of Corrections for the

State of Alabama, filed this action pursuant to the provisions of 28 U.S.C. § 2254 in which he

seeks relief from his conviction and sentence of death imposed August 5, 1983. This action was

originally assigned to another United States District Judge and United States Magistrate Judge.

When the district judge to whom the matter was assigned accepted senior status in July of 1996,

the matter was reassigned to the undersigned district judge and referred to another magistrate

judge. In order to bring this petition to resolution, the reference to the magistrate judge is

WITHDRAWN.

Bradley was convicted of capital murder in the death of his twelve-year-old stepdaughter

who had been raped and sodomized. Bradley's conviction was predicated upon the law of the

State of Alabama found at *Alabama Code* § 13A-5-40(a)(3) (1975). Bradley's conviction was

affirmed by the Alabama Court of Criminal Appeals on November 26, 1985. *Bradley v. State*,

494 So.2d 750 (Ala. Crim. App. 1985). The Court of Criminal Appeals denied rehearing on

January 7, 1986. The Supreme Court of Alabama affirmed Bradley's conviction on July 25, 1986.

37

*Ex parte Bradley*, 494 So.2d 772 (Ala. 1986). Rehearing was denied on September 12, 1986.
Bradley filed a petition for writ of certiorari before the Supreme Court of the United States which
was denied on March 9, 1987. *Williams v. Ohio*, 480 U.S. 923 (1987).

On June 4, 1987, Bradley filed a *pro se* petition pursuant to the provisions of Rule 20 of
the *Alabama Rules of Criminal Procedure*.[1/]  On July 8, 1987, counsel was appointed to represent
Mr. Bradley in his post-conviction petition. On March 15, 1988, an amended petition was filed by
counsel. On June 24, 1988, Bradley amended the petition for the second time. On January 9,
1989, the Circuit Court for Calhoun County, Alabama denied Bradley's petition for extraordinary
relief. On January 29, 1989, Bradley filed a notice of appeal with the Alabama Court of Criminal
Appeals. The denial of Rule 20 relief was affirmed. *Bradley v. State*, 557 So.2d 1339 (Ala. Crim.
App. 1989). A petition for writ of certiorari to the Alabama Supreme Court was denied in
February of 1990.

In his § 2254 petition filed in this court, Bradley presents five claims for relief:

(1)  Petitioner's conviction was obtained by use of evidence gained pursuant to
an unconstitutional search and seizure. (Petition at 16).

(2)  The state violated petitioner's due process rights by failing to disclose
material exculpatory evidence which was in its possession and which was
sought in discovery by petitioner's counsel prior to trial. (*Id.* at 29).

(3)  Petitioner's conviction was based upon evidence insufficient to support the
finding that he committed a murder "during the commission" of a rape or
sodomy in the first degree and violates the Eighth and Fourteenth
Amendments. (*Id.* at 44).

(4)  Petitioner's sentencing based upon the application of the statutory
aggravating circumstance that the capital offense was committed while
petitioner was engaged in the commission of a rape violates the Eighth
Amendment. (*Id.* at 50).

---

[1/]     Rule 20 was later incorporated in the re-codified rules as Rule 32.

2

(5)     Petitioner's sentencing based upon the application of the statutory
        aggravating circumstance that the offense of which he was convicted was
        "especially heinous, atrocious or cruel compared to other capital offenses"
        violates the Eighth Amendment. (*Id.* at 51).

Upon consideration of the entire record, the submissions of the parties, and the relevant law, the

court is of the opinion that the petition for writ of habeas corpus is due to be denied.

## I. FACTUAL SUMMARY

On January 24, 1983, twelve-year-old Rhonda Hardin and her younger brother, Gary

"Bubba" Hardin, were left in the care of their stepfather, Danny Joe Bradley. (Trial Tr., Vol. 2 at

211). The children's mother, Judy Bradley, had been hospitalized for more than one week. (*Id.*

at 210). The children normally slept in one bedroom of the residence and the petitioner and Mrs.

Bradley in another. (Trial Tr., Vol. 1 at 112-13). On the night of January 24, 1983, Jimmy Isaac,

Johnny Bishop and Dianne Mobley went to the Bradley home where they saw Rhonda and Bubba

together with Danny Joe Bradley. (*Id.* at 102-03). Bishop, Mobley and Isaac left the Bradley

home at approximately 8:00 p.m. (*Id.* at 102). Rhonda Hardin was watching television with her

younger brother and her stepfather. (*Id.* at 103). Rhonda was lying on the couch, having taken

some medicine earlier in the evening. (*Id.* at 106). She asked her younger brother, Bubba, to

wake her if she fell asleep so that she could move to the bedroom. (*Id.* at 112). When Bubba

decided to go to bed, Danny Joe Bradley told him not to wake Rhonda but to leave her on the

couch. (*Id.* at 113). Bradley also told Bubba not to go to his own bedroom but, rather, to go to

sleep in the room normally occupied by Mr. and Mrs. Bradley. (*Id.*) At approximately midnight,

Bubba awoke when he heard a chair being "bumped" in the kitchen and the back door as it was

unlatched. (*Id.*). At trial, Bubba testified that Bradley had frequently rendered the children

3

unconscious by squeezing their necks. (*Id.* at 114-15).

At approximately 11:30 p.m. Bradley arrived at the home of his brother-in-law, Robert Roland. (Trial Tr., Vol. 1 at 120-21). Roland testified that Bradley arrived driving his automobile. (*Id.*). Roland testified that Bradley was "upset and all" and "acted funny." (*Id.*). "He talked loud and acted like he was nervous and all, which I had never seen him do before." (*Id.*). Bradley's father-in-law also testified that he saw Bradley at approximately midnight. (*Id.* at 124). He testified that Bradley told him that Rhonda was gone. (*Id.* at 126). Bradley's next-door neighbor, Phillip Manus, testified that at approximately 12:50 a.m. Danny Joe Bradley appeared at his home. (*Id.* at 130). Manus testified that Bradley told him that he and Rhonda had argued over some pills Rhonda wanted to take. (*Id.* at 130-31). He claimed that he had fallen asleep and when he awoke, Rhonda was missing. (*Id.* at 131). Bradley then said "[l]et me run over to Rhonda's grandma's house and I'll be back in a few minutes." (*Id.*). Bradley returned ten or fifteen minutes later. (*Id.*). Manus suggested that they walk to the hospital to tell Judy Bradley that Rhonda was missing. (*Id.* at 132). Manus testified that Bradley wanted to go to the hospital rather than report Rhonda's disappearance to the police. (*Id.* at 133). Manus and Bradley remained at the hospital for one and one-half hours before they were able to enter Mrs. Bradley's room. (*Id.*). Throughout that period of time, Manus tried to persuade Bradley to go to the police station to report Rhonda missing. (*Id.* at133-34). When the men were able to see Mrs. Bradley, she told Danny Joe Bradley to report Rhonda's disappearance to the police. (*Id.* at 134).

Manus and Bradley went to the police station where Bradley told Officer Ricky Doyle that his step-daughter was missing. (Trial Tr., Vol 1 at 180). Bradley also told Doyle that he and Rhonda had argued earlier in the evening and that she left the house. (*Id.*). He said that he had

4

been out looking for her. (*Id.*). Bradley told Doyle that Rhonda had left the house sometime around 11:00 or 11:30 p.m. (*Id.*). Bradley claimed that he had fallen asleep and that when he awoke, Rhonda was gone. (*Id.*). He stated that he left the house at 11:30 p.m. to go to his neighbor's house to look for Rhonda. (*Id.*). Bradley specifically indicated that he had not left the house until he began looking for Rhonda and that he had gone to the Manus home when he learned Rhonda was missing. (*Id.* at 180-181). After talking with Doyle, Bradley and Manus returned to Manus's apartment. (*Id.* at 135).

At approximately 7:30 a.m. on January 25, 1983, the body of twelve-year-old Rhonda Hardin was found in a wooded area near McKee Street. (Trial Tr., Vol. 1 at 143-44). The body was found less than six-tenths of a mile from Bradley's apartment. (*Id.* at 160). Rhonda's body was dressed in a pair of maroon-colored corduroy pants, a short-sleeved red knit shirt, green, white, brown and purple striped leg warmers, a brassiere and a blue windbreaker. (Trial Tr., Vol. 2 at 259). Rhonda's tennis shoes were tied in single knots. Several members of her family testified that she habitually tied her shoes in double knots. (*Id.* at 209, 235).

At approximately 8:30 a.m. on January 25, 1983, Danny Joe Bradley was transported to the police station in Piedmont, Alabama. (Trial Tr., Vol. 1 at 8). He provided fingernail scrapings. (*Id.* at 147). He told police officers he had discovered Rhonda missing at approximately 11:20 or 11:25 p.m. and had gone to Phillip Manus's house in search of her. (*Id.* at 188). He told officers that he had not left the apartment until he began his search for Rhonda. (*Id.* at 187-88). While at the police station, Bradley signed a consent to search his residence. (*Id.* at 9). In that search, police seized a pillowcase and a damp, blue towel from a bathroom closet. (Trial Tr., Vol. 2, at 219-20).   The living room light switch plate cover was also taken. (*Id.*).

5

The police removed a red, white and blue sheet from the children's bedroom and a white "heavy" sheet from the washing machine. (*Id.* at 221). Officers also obtained fiber samples from the trunk of Danny Joe Bradley's Ford Galaxy automobile parked at the residence. (*Id.* at 220). Bradley also provided blood, hair and saliva samples to police officers. (Trial Tr., Vol. 1 at 12).

The day after Rhonda's funeral a witness overheard Danny Joe Bradley say "I know deep down in my heart that I done it." (Trial Tr., Vol. 2 at 233). When he was asked if he knew what he had said, Bradley stated "No, what?" (*Id.* at 234). When he was told that he had said that "in his heart" he knew he had killed Rhonda, he replied "well, if the law had been here, I'd done been gone by now." (*Id.*).

Prior to the trial, the court considered two motions to suppress evidence filed on behalf of the petitioner. The court denied each motion. At trial, the state demonstrated that, contrary to his statements to police on both January 24 and January 25, 1983, Police Officer Bruce Murphy had seen Bradley in his car at 9:30 p.m. in the area where Rhonda's body was discovered. (Trial Tr., Vol. 1 at 197). Murphy, who had known Bradley for more than twenty years, was able to positively identify him. (*Id.*). Through the fiber evidence, the state proved that the fingernail scrapings taken from Danny Joe Bradley matched the red, white and blue sheet taken from the children's bedroom, the fibers from the leg warmers found on Rhonda Hardin's body and the cotton from Rhonda's burgundy colored pants she had worn on January 24, 1983. (Trial Tr., Vol. 2 at 223-24). The state also proved that fiber found in the trunk of Danny Joe Bradley's car matched the fibers from Rhonda's clothing. (*Id.* at 224). A pathologist testified that Rhonda's body had "evidence of trauma--that is, bruises and abrasions on her neck." (*Id.* at 242). She had seven wounds on her neck; the largest was an abrasion over her Adam's apple. (*Id.* at 244). The

6

pathologist testified that he had taken swab and substance smears from Rhonda's mouth, rectum and vagina. (*Id.*). He also removed the gastric contents from Rhonda's stomach and turned them over to the toxicologist. (*Id.* at 244-45).

An expert in forensic serology testified that Danny Joe Bradley and Rhonda Hardin were of type O blood. (*Id.* at 257). Bradley was a non-secretor of the H-antigen. (*Id.* at 259). Rhonda Hardin was a secretor. (*Id.*). The serology expert testified that the H-antigen was not present in the semen taken from the rectal swab of Rhonda Hardin. (*Id.* at 264-65). The rectum does not produce secretions or H-antigens. (*Id.* at 254). On the inside of Rhonda's pants, a stain containing a mixture of fecal-semen was found with spermatozoa present. (*Id.* at 265). The pillowcase found in the bathroom revealed high levels of seminal plasma and spermatozoa consistent with the type O blood group. (*Id.* at 265-66). There were small blood stains on the pillowcase mixed with saliva. (*Id.* at 266). These stains were also consistent with an O blood group. (*Id.*).

The red, white and blue sheet on the bed in the children's bedroom contained a four by two and one-half inch stain which included spermatozoa. (*Id.* at 267). The white blanket which had been placed in the washing machine also had two large stains consistent with fecal-semen. (*Id.*). In both stains, spermatozoa was present and no H-antigens were detected. (*Id.*). A combination of semen and sperm with H activity was found on the blue towel located in the bathroom. (*Id.* at 268). The serologist testified that the low level of H-antigen was consistent with a female secretor because the H-antigen is present in low levels in the vagina. (*Id.* at 253). The blue towel also contained vaginal-semen stain. (*Id.* at 268). The mattress cover contained a number of seminal stains. (*Id.* at 268-69).

7

Bradley testified in his own defense. (Trial Tr.; Vol. 2 at 314-49). He explained his inconsistent statements to police by suggesting that he had left his home at the time he was observed by Officer Murphy, but that he had intended to steal a car, remove its motor and sell it. (*Id.* at 315). He claimed that Gary Hardin, the father of Bubba and Rhonda, had asked him to obtain such a motor. (*Id.* at 339). Hardin testified that he had made no such request. (*Id.* at 354).

The jury returned a verdict of guilty of capital murder on counts one and three of the indictment. (Trial Tr., Vol. 3 at 416). These counts charged murder during the commission of a rape or sodomy in the first degree. The same jury deliberated in the punishment phase and recommended twelve to zero that Danny Joe Bradley be sentenced to death. (*Id.* at 440).

## II. DISCUSSION

### A.     The Fourth/Fifth Amendment Claims

Bradley contends that his conviction was the product of evidence illegally obtained by the police in violation of his Fourth and Fifth Amendment rights. Prior to trial, Bradley filed two motions to suppress. The first motion averred that ". . . any statements or consent made by the defendant were as a result of the illegal arrest and the illegal detention of the Defendant and thus, such statements or consent should be suppressed." (Trial Tr., Vol. 3 at C-33). The second motion specifically sought to suppress "all evidence obtained pursuant to a search of the Defendant's residence and automobile in that the search and seizure was illegal . . ., that the arrest of the defendant on or about January 25, 1983, was unconstitutional and illegal . . . said arrest being without a warrant and without reasonable cause. Thus, the subsequent search of the Defendant's residence and automobile was a direct and proximate result of the illegal arrest...." (*Id.* at C-36). The trial court conducted a hearing to consider the merits of each motion. (Trial

8

Tr., Vol. 1 at 4-67). Bradley offered his own testimony together with that of Detective Sergeant

Charles Brown, Charlise Bennett and Brenda Manus. (*Id.*). Police Chief David Amberson, and

Officers Murphy and Gregory Kiser, testified at the request of the state. (*Id.*).

The trial court denied each motion to suppress. The trial court did not enter written

findings of fact. The court's oral ruling on the motion was as follows:

> THE COURT: The court has listened very carefully to the evidence
> and the testimony that's been presented to this court last Friday
> afternoon, and to the further testimony presented this morning, the
> arguments of counsel.
> I have read the cases that have been cited to the court on this
> matter. That includes the case of *State of Alabama v. James E.
> Meeks* and the United States Supreme Court's decision of *Florida
> versus Royer*, a 4-1-4 decision, four justices joining in the opinion
> as written, one concurring in the result, four dissenting. In the
> opinion and that's by Justice White, he makes a very interesting
> observation. He says, "We do not suggest that there is a litmus
> paper test for distinguishing a consensual encounter from a seizure
> or for determining whether a seizure exceeds the bounds of an
> investigative stop. Even in the discrete category of airport
> encounters, there will be endless variations in the facts and
> circumstances, so much variations that it is unlikely that the courts
> can reduce to a sentence or paragraph a rule that will provide
> unarguable answers to the question whether there has been an
> unreasonable search and seizure in violation of the Fourth
> Amendment."
> Upon full consideration of the evidence and the law as understood
> by the court, it is the finding of this court as to the defendant's two
> motions to suppress, that they are due to be and are hereby denied.

(Trial Tr., Vol. 1 at 67).

On direct appeal, Bradley pursued the issue this way:

> Did the trial court commit error by allowing into
> evidence the results of search of the defendant's
> house pursuant to a consent form signed while the
> defendant was in custody without an arrest warrant
> or probable cause to arrest?

9

(Respondents' Exhibit 13 at 2). The Court of Criminal Appeals addressed Bradley's challenge to his consent to search his home on both Fourth and Fifth Amendment grounds. *Bradley*, 494 So.2d at 755-766. The Court of Criminal Appeals's disposition of Bradley's search and seizure issue was unanimously affirmed by the Alabama Supreme Court. *Ex parte Bradley*, 494 So.2d 772 (Ala. 1986) (Justice Jones, dissenting: "I agree with the Court of Criminal Appeals' opinion on each of the issues addressed therein except one: [the *Brady* claim]").

The principal facts which underlie Bradley's search and seizure claim are undisputed. At approximately 7:30 a.m. on January 25, 1983, four police officers arrived at the home of Danny Joe Bradley--Officer Murphy, Chief Amberson, Deputy Glass and Officer Kiser. (Trial Tr., Vol. 1 at 36). Bradley was handcuffed by the officers after being placed spread-eagle on the hood of a vehicle. (*Id.* at 37). Bradley was transported to the Piedmont Police Station in the custody of Deputy Glass and Officer Murphy. (*Id.* at 37-41). None of the officers ever advised Bradley that despite being handcuffed, he was not under arrest. (*Id.* at 35-47). At the police station, Bradley's handcuffs were removed. (*Id.* at 8, 11). At approximately 10:00 a.m., Detective Sergeant Brown read Bradley his *Miranda* rights. (*Id.* at 27, 184-185). After Bradley's rights were read to him, Sergeant Brown asked Bradley certain identifying information. (*Id.* at 185). He stopped asking questions until Alabama Bureau of Investigation (ABI) Sergeant Wetzel arrived at approximately noon. (*Id.*). In conversations with Detective Sergeant Brown, Bradley told the investigator the same version of events that he had relayed to Officer Ricky Doyle at 3:30 a.m. (*Id.* at 186-189). At approximately 10:50 a.m. Officer Greg Kiser had obtained fingernail scrapings from Bradley. (*Id.* at 147, 169). At approximately 11:08 a.m. Bradley signed a consent to search his home and vehicle. (*Id.* at 28, 166). At 4:00 p.m. hair samples also were obtained from Bradley. (*Id.* at

10

169). At 4:30 or 5:00 p.m. Bradley was driven to the Department of Public Safety office in Birmingham, Alabama. (*Id.* at 25). Bradley provided blood and saliva samples to a technician at the Piedmont Medical Clinic. (*Id.* at 12). Bradley testified that the police officer told him he could either give the samples or they could get a court order. (*Id.* at 19). Bradley was returned to his home at approximately 4:00 a.m. on the morning of January 26, 1983. (*Id.* at 13).

On January 27th, two days after Rhonda's body was found, Bradley executed a second consent to search his residence. (Trial Tr., Vol. 1 at 152). When the second search was conducted, Mrs. Bradley was present. (*Id.*). Mrs. Bradley gave the police officers a soiled pair of Rhonda's underwear. (*Id.* at 153). Bradley was returned to City Hall three or four times after he was "picked up" on January 25th. (*Id.* at 20). Each time he was accompanied by police officers. (*Id.*). Prior to his encounter with police officers on the morning of January 25, 1983, Bradley had been arrested numerous times and at the time of his arrest he was on probation for a 1982 burglary conviction. (Trial Tr., Vol. 2 at 316, 320).

The Alabama Court of Criminal Appeals, in assessing the trial court's ruling on the two motions to suppress, framed the issues this way:

> This Court must first determine whether Bradley was arrested or whether his situation was consensual. If an arrest occurred, the legality of that arrest must be determined. If the arrest was illegal, we must decide first, whether Bradley's consent to search and statements were voluntary within the confines of the Fifth Amendment, and, if so, then whether they were the tainted product of an illegal arrest and seizure. If Bradley was illegally arrested, this court makes two determinations. First, whether the consent to search and the statements were voluntarily given within the meaning of the Fifth Amendment of the United States Constitution. If the consent and statements were voluntarily given, this Court must then determine whether each was sufficiently an act of free will to purge the primary taint of the illegal arrest. . . .

11

*Bradley*, 494 So.2d at 755.

The appellate court also concluded that the trial court's apparent but unstated premise, that Bradley had consented to the encounter with police by voluntarily accompanying them to cooperate in the investigation, was not supported by the evidence. *Id.* at 760. The appellate court concluded that the evidence was insufficient to support the conclusion that Bradley had consented to accompanying the police to the station. *Id.* The Court of Criminal Appeals held that Bradley had been arrested and that his arrest was "without his consent and illegal because it was without probable cause." *Id.*

The Court of Criminal Appeals then specifically undertook an analysis of the Fifth Amendment voluntariness of Bradley's consent to search and his statement to Detective Sergeant Brown. The Court of Criminal Appeals, citing *Taylor v. Alabama*, 457 U.S. 687 (1982), *Dunaway v. New York*, 442 U.S. 200 (1979), and *Brown v. Illinois*, 422 U.S. 590 (1975), also addressed the Fourth Amendment aspect of Bradley's claim, recognizing that "the State must prove two things: that the statement and consent are voluntary for the purposes of the Fifth Amendment and that they were not the product of the illegal seizure. These two tests are distinct and independent even though they may overlap." *Bradley*, 494 So.2d at 761-62. The Court of Criminal Appeals concluded that a review of the record provided a sufficient factual basis to reach the legal conclusion that Bradley's statement was admissible as was the evidence obtained pursuant to the consent form signed on January 25th at 11:08 a.m. *Id.* at 766. The Court of Criminal Appeals found that Bradley's statements were not obtained through an exploitation of an illegal arrest in part because Bradley had provided the same statement prior to his arrest on

12

January 25th. *Id.* The court also specifically concluded that the consent to search was not the product of the illegal arrest. *Id.*

### 1. Fifth Amendment Claim

Bradley argues that his statement given to the police on January 25-26, 1993 should have been excluded by the trial court because it was obtained in violation of the Fifth Amendment. (Petition at 20-24). Even though Bradley testified that he had been read his Miranda rights, he claims that a Fifth Amendment violation occurred because he was interrogated by a number of police officers following a patently illegal arrest. (*Id.* at 21). Bradley asserts that due to this "highly coercive situation," it cannot be said that his statement and consent were given voluntarily. (*Id.*).

Probable cause is required for an "involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes." *Hayes v. Florida*, 470 U.S. 811, 815 (1985). "[R]easonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative." *Florida v. Royer*, 460 U.S. 491, 499 (1983). It is clear that the morning Bradley was picked up for questioning, the police had no probable cause to arrest him.

The facts also support the opinion of the Alabama Court of Criminal Appeals that Bradley was arrested. Bradley was handcuffed by the police. He was never told that he was not under arrest. Furthermore, there is no testimony that Bradley was given any alternative other than accompanying the police. A reasonable person in Bradley's shoes would have believed that he was under arrest once he was handcuffed and placed in the patrol car. Because the police had no probable cause to arrest Bradley, but they did so anyway, the arrest was illegal.

13

In order to determine whether Bradley's statement was obtained in violation of the Fifth Amendment, this court must determine whether it was given voluntarily. Bradley gave his statement after he had been informed of his constitutional rights under *Miranda*. Bradley claims that because he was in custody due to an illegal arrest and was questioned by a number of officers, it demonstrates a highly coercive situation whereby he did not voluntary give up his *Miranda* rights. However, the facts do not support this argument. Neither the fact that he was subject to an illegal arrest nor that he was in custody demonstrates an atmosphere that could be deemed so coercive as to render his waiver of his Miranda rights involuntary. Because there is no evidence of undue pressure or influence, one must conclude that Bradley's waiver was given voluntarily. Because Bradley knowingly, intelligently, and voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), his statement was not taken in violation of the Fifth Amendment.

## 2. Fourth Amendment Claim

In *Stone v. Powell*, 428 U.S. 465, 494 (1976), the Supreme Court established a general rule that criminal defendants may not seek collateral review of Fourth Amendment exclusionary rule claims under § 2254 if they received "an opportunity for full and fair litigation" of their Fourth Amendment claims in state court. The court based its decision on a concern for judicial economy stating that the "justification [for the exclusionary rule] becomes minimal where . . . a prisoner . . . previously has been afforded the opportunity for a full and fair consideration of his search-and-seizure claim at trial and on direct review." *Id.* at 486. The opportunity to present a Fourth Amendment claim to the state trial and appellate courts, whether or not that opportunity is exercised or proves successful, constitutes "an opportunity for full and fair consideration" of the

14

defendant's Fourth Amendment claim under *Stone* absent sufficient factual allegations and proof that the state process is "routinely or systematically applied in such a way as to prevent the actual litigation of fourth amendment claims on their merits." *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980).

The former Fifth Circuit Court of Appeals interpreted "'full and fair consideration' of a Fourth Amendment claim to include at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute, and full consideration by an appellate court when the facts are not in dispute." *Caver v. Alabama*, 577 F.2d 1188, 1191 (5th Cir. 1978).[2/] In *Caver,* the Fifth Circuit specifically recognized that "[the Supreme Court] noted that the primary justification for the exclusionary rule is the deterrence of police conduct that violates the fourth amendment . . . and [expressed its] unwilling[ness] to assume that state trial and appellate courts are insensitive to federal constitutional rights." *Id.* at 1192. There is no question that the doctrine of *Stone v. Powell*, which precludes federal habeas consideration of Fourth Amendment issues, applies in capital cases in the Eleventh Circuit Court of Appeals. *See Devier v. Zant*, 3 F.3d 1445, 1455 (11th Cir. 1993).

A review of the Court of Criminal Appeals opinion in *Bradley v. State*, 494 So.2d 750 (Ala. Crim. App.), *aff'd*, 494 So.2d 772 (Ala. 1986), demonstrates that Danny Joe Bradley received a full and fair opportunity to litigate his Fourth Amendment claims and, further, received full and fair consideration of those claims. His claims are barred by *Stone v. Powell*.

---

[2/]     The Eleventh Circuit has adopted as binding precedent all former Fifth Circuit decisions rendered prior to October 1, 1981 (to the extent they are not superceded by subsequent Eleventh Circuit decisions). *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981).

15

In his attempt to avoid the application of *Stone v. Powell*, Bradley makes three arguments.

First, Bradley contends that an opportunity for full and fair litigation of a Fourth Amendment

claim "contemplates recognition and at least colorable application of the correct Fourth

Amendment constitutional standards." (Petition at 16, citing *Gamble v. State of Oklahoma*, 583

F.2d 1161 (10th Cir. 1978)). The Tenth Circuit, in *Gamble*, held that:

> [A] federal court is not precluded from considering
> Fourth Amendment claims in habeas proceedings
> where the state court willfully refuses to apply the
> correct and controlling constitutional standards.
> Deference to state courts' consideration of Fourth
> Amendment claims does not require federal
> blindness to a state court's wilful refusal to apply the
> appropriate constitutional standard.

*Id.* at 1165 (emphasis added). In *Gamble*, the courts of the state of Oklahoma failed to note,

much less distinguish, the applicability of *Brown v. Illinois*, 422 U.S. 590 (1975), nor did the

courts incorporate the factors identified in *Brown* into its analysis. *Id.* From the unique facts in

*Gamble*, it was clear that the state court specifically declined to apply the appropriate federal

standard and rather applied the very standard that the Supreme Court had rejected in *Brown. Id.*

at 1165-66. The primary issue in *Gamble* was whether the petitioner's Fourth Amendment claim

had been "afforded an 'opportunity for full and fair litigation' within the meaning of *Stone*." *Id.* at

1164.

In contrast, Bradley presents this court with the same argument and essentially the same

case law he presented in the Alabama courts. He ignores the fact that the Alabama courts

conducted a factual and constitutional analysis, explicitly based upon *Brown v. Illinois, Dunaway

v. New York*, and *Taylor v. Alabama*. Bradley seeks to have this court reverse the holding of the

16

Alabama appellate courts merely because he is unhappy with the result in his case as opposed to the constitutional analysis employed to reach that result.

In order for *Gamble* to apply, the Alabama Court of Criminal Appeals must have either willfully refused to consider Bradley's Fourth Amendment claim or ignored it altogether. Instead, Bradley argues that the court misapplied the law, but admits that the court correctly cited the controlling cases. Thus, Bradley wants this court to extend *Gamble* so that any misapplication of controlling Fourth Amendment law renders *Stone v. Powell* inapplicable. However, the controlling law of the Eleventh Circuit does not support this position.[3] In *Swicegood v. State of Alabama*, 577 F.2d 1322, 1324 (5th Cir. 1978), the former Fifth Circuit Court of Appeals stated:

> Appellant's second point that the state denied him a fair hearing by misapplying federal constitutional standards also must fail. If this argument were correct, the federal courts would consider the merits of fourth amendment habeas cases whenever the state court erred in their fourth amendment analysis and would refuse to consider the merits of those cases in which the state courts were correct. That, of course, is federal habeas review of state court Fourth Amendment decisions, precisely what *Stone* forbids. If the term "fair hearing" means that the state courts must correctly apply federal constitutional law, *Stone* becomes a nullity.

---

[3]     *See also Terrovona v. Kincheloe*, 912 F.2d 1176, 1179 (9th Cir. 1990) (Terrovona contended that the state courts denied him the opportunity for full and fair litigation of his warrantless arrest claim because they failed to apply the standards enunciated in *Payton v. New York*, 445 U.S. 573 (1980); the court rejected the claim on *Stone v. Powell* preclusion grounds); *Dortch v. O'Leary*, 863 F.2d 1337, 1341-42 (7th Cir. 1988) (Dortch argued that the state courts denied him an opportunity for full and fair litigation of his Fourth Amendment claim because they failed to apply proper constitutional standards; the court rejected the argument on *Stone v. Powell* preclusion grounds.); *Gilbert v. Parke*, 763 F.2d 821, 823-24 (6th Cir. 1985) ("The petitioner does not claim that the state failed to provide a mechanism for which Fourth Amendment claims could be raised. . . . [He] contends that the Kentucky Supreme Court egregiously misapplied *Payton* and that this court, like the Tenth Circuit in *Gamble*, should reach the merits. We disagree.").

Bradley refers to two Eleventh Circuit cases which he contends provide support for his contention that misapplication of Fourth Amendment principles by state courts renders *Stone v. Powell* inapplicable. In *Tukes v. Dugger*, 911 F.2d 508, 514 (11th Cir. 1990), a panel of the Eleventh Circuit concluded that a Fourth Amendment issue could be considered when the issue was presented in a motion to suppress which was denied in the trial court. The panel expressly found the reason the issue could be considered in a federal habeas proceeding was that "[t]he trial court's failure to make explicit findings on the matters essential to the fourth amendment issue, combined with the fact that the state appellate court issued only a summary affirmance, precluded a conclusion in this case that the state provided the meaningful appellate review necessary to erect a *Stone v. Powell* bar to our review of the claim." *Id.* (emphasis added). *Tukes* simply stands for the proposition that when the state court fails "to make explicit findings essential to a fourth amendment issue" *and* the appellate court "issue[s] only a summary affirmance," *Stone v. Powell* is inapplicable. *Id.* Here, Bradley does not suggest that the Alabama courts ignored his Fourth and Fifth Amendment issue. He merely objects to the analysis. "Petitioner disagrees strenuously with the Court of Criminal Appeals' analysis of both the Fifth and Fourth Amendment issues." (Petition at 20)(emphasis added). Bradley cannot seriously contend that he did not receive a full and fair hearing on his motion to suppress. Neither can Bradley suggest that the Court of Criminal Appeals failed to consider his Fourth Amendment claim.

In *Agee v. White*, 809 F.2d 1487 (11th Cir. 1987), the Eleventh Circuit stated that "[a]lthough both at trial and on direct appeal appellant argued that the second statement was inadmissible because of the residual taint from the initial, illegal arrest, the Court of Criminal Appeals ignored this contention in its opinion. The claim, accordingly, is properly before this

18

court, for the appellant did not receive a 'full and fair consideration of his search-and-seizure claim at trial and on direct review.'" *Agee*, 809 F.2d at 1490(emphasis added). As was the case in *Tukes, Agee* addressed only a complete absence of any consideration of a Fourth Amendment claim. Thus, *Agee* does not support Bradley's contention that a "misapplication" of federal constitutional standards constitutes a denial of a full and fair opportunity to litigate the claim.[4]

Bradley's second argument is that the Alabama courts unconstitutionally failed to review his Fourth Amendment issues. As Bradley states, his claims which arise under the Fourth and Fifth Amendment relate to a statement and consent to search which was signed following his illegal arrest. The Court of Criminal Appeals addressed the precise standards Bradley asserts are required to ensure a "full and fair" consideration of the petitioner's claims. That is, (1) whether the statement and consent Bradley provided were voluntary as contemplated within the Fifth Amendment, and (2) whether the evidence was to be excluded under the Fourth Amendment as a product of Bradley's illegal arrest. Bradley contends, however, that the Court of Criminal Appeals misapplied the federal constitutional principle established in *Brown v. Illinois*, *Dunaway v. New York*, and *Taylor v. Alabama*.[5] Bradley correctly observes that the "attenuation" factors

_____

[4] *See also Craig v. Singletary*, 80 F.3d 1509 (11th Cir.), *opinion clarified*, 97 F.3d 445 (11th Cir. 1996), *rev'd on other grounds*, 127 F.3d 1030 (11th Cir. 1997) (*en banc*). In this case decided after the filing of Bradley's petition, the Eleventh Circuit Court of Appeals addressed a claim made pursuant to *Taylor v. Alabama* and *Brown v. Illinois*. The court did so, however, after concluding that "[t]he Florida state courts did not afford Craig a full and complete hearing on his Fourth Amendment claim because the state court did not address the Fourth Amendment claim . . . so *Stone v. Powell* . . . does not preclude review." *Craig*, 80 F.3d at 1513. As in *Tukes* and *Agee*, the "exception" to *Stone v. Powell* identified in *Craig* is not the quality of the analysis of the constitutional claim but, rather, the failure to consider the issue at all.

[5] Bradley also appears to suggest that the Court of Criminal Appeals may not have applied *Brown* at all when he states "the only suggestion by the court that it is applying the *Brown* factor is the sole sentence that '[t]he giving of the *Miranda* warnings and the signing of a consent to search form can satisfy the requirements of the intervening circumstances.'" (Petition at 28). This observation, if it is meant to imply that the *Brown* factors were not considered, is wrong. The Court of Criminal Appeals specifically predicated its analysis on *Brown v. Illinois, Dunaway v. New York*, and *Taylor v. Alabama*. The Petition acknowledged that the Court of Criminal Appeals applied *Brown*. (*Id.* at 27 n.16).

19

of *Brown v. Illinois*, as considered in *Dunaway v. New York*, include (1) the temporal proximity of

the arrest and the statement/consent of the defendant; (2) the presence of intervening

circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at

603-04.  In *Brown*, the Supreme Court wrote:

> It is entirely possible . . . that persons arrested
> illegally frequently may decide to confess as an act
> of free will unaffected by the initial illegality. . . .
> The question whether a confession is a product of
> free will under *Wong Sun* must be answered on the
> facts of each case.  No single fact is dispositive.  The
> workings of the human mind are too complex and
> the possibilities of misconduct too diverse to permit
> the protections of the Fourth Amendment to turn on
> such a talismanic test.  The *Miranda* warnings are an
> important factor, to be sure, in determining whether
> the confession is obtained by exploitation of an
> illegal arrest.  But they are not the only factors to be
> considered.  The temporal proximity of the arrest
> and the confession, the presence of intervening
> circumstances, . . . and, particularly, the purpose and
> flagrancy of the official misconduct are relevant.

*Id*. (emphasis added).

As the Supreme Court made clear in *Dunaway v. New York*:

> [T]he relevant inquiry [is] 'whether [petitioner's]
> statements were obtained by exploitation of the
> illegality of his arrest' . . . [which] focus[es] upon
> 'the causal connection between the illegality and the
> confession.'(citations omitted)

*Dunaway* , 442 U.S. at 217 (emphasis added).  While the *Brown* factors are relevant, they are not

stated as the exclusive test.  The issue ultimately to be decided is whether the illegal arrest was

exploited in obtaining the consent and statement.  Thus, in Bradley's case, the Alabama Court of

Criminal Appeals quite properly could consider whether Bradley's proffered intent to cooperate

20

was an appropriate factor to be considered in determining whether the consent was causally linked to the illegal arrest. *Brown* certainly leaves open this possibility when it holds that "[n]o single fact is dispositive." *Brown*, 422 U.S. at 603. The Court of Criminal Appeals could consider as it did that "at the police station the Defendant was fully advised of his legal right and indicated his desire to cooperate with legal authority." *Bradley*, 494 So.2d at 760. The fact that Bradley was not photographed, fingerprinted or confined so as to enhance the coercive effect of his appearance at the police station is relevant to the issue of exploitation.

The Court of Criminal Appeals considered the "totality of all the circumstances" in this particular case as directed by the Supreme Court in *Brown* when it stated that the question of whether a confession is the product of free will must be answered on the facts. *Id.* The court noted Bradley's insistence that he wanted to stay until things could be cleared up because he was "acting the part of the 'cooperating, aggrieved father' concerned about his stepdaughter's disappearance." *Id.* at 764. "His consent to search and his statements were obviously given 'with the hope that his cooperation would result in his elimination as a suspect.'" (citation omitted) *Id.* The Court of Criminal Appeals considered it significant that Bradley initiated the contact with the police early in the morning of January 25th. The Court of Criminal Appeals clearly considered, in addition to the *Miranda* warnings, Bradley's own motive as evidenced by his earlier appearance at the police station in assessing intervening circumstances.

Bradley's third argument in support of his contention that he was denied a full and fair consideration of his Fourth and Fifth Amendment claims is his suggestion that in its analysis of the issues, the Court of Criminal Appeals erred in relying upon the trial court's "credibility choices"

21

on the related Fifth Amendment and Fourth Amendment issues.[6/] (Petition at 18, 22). Factual

determinations of a state appellate court in a habeas proceedings are generally accorded a

presumption of correctness. *Dickerson v. Alabama,* 667 F.2d 1364, 1368 (11th Cir. 1982).

Bradley's claim begins with a fatally flawed premise. Bradley assumes that the Court of Criminal

Appeals found the testimony of the police officers as to their subjective intent at the time they

took Bradley into custody to be incredible while simultaneously finding their testimony concerning

their conduct at the police station to be credible. The Court of Criminal Appeals reached no such

conclusion. In *Craig v. Singletary*, 127 F.3d 1030 (11th Cir. 1997), the *en banc* Court of

Appeals observed that the subjective intent of the police and the subject of police action are each

irrelevant to the Fourth Amendment analysis when it wrote:

> The applicable test [for Fourth Amendment seizure]
> manifestly is not a subjective one. Instead, "a
> person has been 'seized' within the meaning of the
> Fourth Amendment only if, in view of all of the
> circumstances surrounding the incident, a reasonable
> person would have believed that he was not free to
> leave." *Id.*; *accord, e.g., Immigration and
> Naturalization Service v. Delgado*, 466 U.S. 210,
> 216, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)
> ("Unless the circumstances of the encounter are so
> intimidating as to demonstrate that a reasonable
> person would have believed he was not free to leave
> if he had not responded, one cannot say that the
> questioning resulted in a detention under the Fourth
> Amendment.") Thus the suspect's subjective views
> are not determinative. Nor are the subjective views
> of the law enforcement officers . . . relevant except
> to the extent they were communicated to the suspect
> at the time.(citation omitted).

---

[6/] "Petitioner submits that the appellate court's reliance on the same credibility determinations by the trial court to affirm its Fifth Amendment voluntariness determination which it found to be clearly erroneous and necessarily rejected in conjunction with the analysis of the arrest issue does not constitute the 'full and fair consideration' of his Fifth Amendment claim with regard to the voluntariness of his consent which would insulate it from review by this Court." (Petition at 22).

*Craig*, 127 F.3d at 1041.

Using this proper standard, the Court of Criminal Appeals concluded that Bradley had been arrested, not because it rejected the officers' subjective belief that they were not arresting him, but rather because "circumstances of this particular case as contained in the record convince[d] [them] that a reasonable person in Bradley's shoes would have thought he was under arrest when he was handcuffed and placed in the sheriff's patrol car. There is no evidence that Bradley was told why he was handcuffed, that he was not under arrest, that he was free to leave, that he could meet the police at the station or that he could come at another time." *Bradley*, 494 So.2d at 759. The court went on to state that "[g]enerally and except in the most exceptional circumstances a person must be considered under arrest once he has been handcuffed." *Id.* The Court of Criminal Appeals did not determine that Bradley's version of the events prior to his detention was believable. Indeed, the Court of Criminal Appeals noted that "[e]ven <u>if we assume that the trial court did not believe Bradley's testimony</u>, the state's evidence does not show that the prosecution carried its burden of proving that Bradley freely and voluntarily consented to accompany the police. The evidence is simply insufficient to support such a finding. Consequently, we must conclude that Bradley's arrest was without his consent and illegal because it was without probable cause." *Id.* at 760. (emphasis added).

The appellate court recognized that Bradley's testimony was irrelevant to the threshold question of whether he had been "arrested." Equally irrelevant was the subjective intent of the police officers. The Court of Criminal Appeals obviously and correctly held that whether or not the officers thought they were arresting Bradley, a reasonable person in Bradley's position would

23

have believed himself to be under arrest. This conclusion does not require assigning any credibility to Bradley's testimony.

Nothing in the Court of Criminal Appeals analysis indicates that the Alabama court willfully refused to apply the appropriate constitutional standard. Bradley has failed to establish that the analysis of the Fourth Amendment claim by the Alabama courts was legally or factually deficient. Rather, Bradley acknowledges that the court cited the correct authority but disagrees with its analysis. His Fourth Amendment claim is barred by *Stone v. Powell*.

## B. *Brady v. Maryland* Claim

Bradley contends that the state suppressed three specific items of information which he argues constituted "evidence" material to his defense and that the information was of such a character that the non-disclosure denied him a constitutionally fair trial. Bradley premises his claims upon the due process obligations of the prosecution first articulated in *Brady v. Maryland*, 373 U.S. 83 (1963). Bradley also argues that the "evidence" withheld requires a new trial under the standard announced in *Kyles v. Whitley*, 514 U.S. 419 (1995). The nature of the information Bradley contends was not disclosed and the investigative context in which it was received is of sufficient importance that it must be described in some detail. The information at issue consisted of (1) the identity of a civilian to whom another suspect allegedly confessed to the murder; (2) a memorandum or note made by a Piedmont City Investigator after receiving an anonymous telephone call in which it was reported that a second suspect had claimed that he had committed the murder of Rhonda Hardin; and (3) a note received by an investigator in another county which was turned over to Piedmont police officers in which yet a third suspect was purported to have implicated himself in the crime.

24

In the weeks following the murder of twelve-year-old Rhonda Hardin, her death was a much discussed event both among law enforcement officers and the community at large. District Attorney Robert Fields testified at Bradley's Rule 20 hearing that because Piedmont was a small community, those persons with a reputation for violence were discussed as potential suspects almost immediately after the murder. (Rule 20 Tr., Vol. 1 at 28). In addition to discussions among law enforcement officers, a number of potential "suspects" were being discussed by the community at large. (*Id.*). Among those discussed by name as a suspect from the early stages of the investigation was Ricky McBrayer. (*Id.* at 31). McBrayer was by no means the only potential suspect identified by name. At a minimum the list included Phillip Manus, Robert Roland, Jimmy Isaacs, Johnny Bishop, Donald Roberts, Keith Sanford, Bill Goodwin, Charlie Grissom, Phillip Hass, and Carter Doss. (Trial Tr., Vol. 3 at C-7, C-8). During the Rule 20 proceeding, Bradley's attorneys acknowledged that they had learned very early in their involvement in the case that Ricky McBrayer was among at least seven or eight other named "suspects" mentioned during the investigation. (Rule 20 Tr., Vol. 1 at 109). Bradley's attorneys also had heard in the community at large that McBrayer may have been involved. (*Id.* at 110).

At least ten police officers or agents from several different agencies investigated Rhonda Hardin's murder. Piedmont Police Chief David Amberson testified that he was a "co-investigator." (*Id.* at 39). In addition to Chief Amberson and Detective Sergeant Brown, other members of the Piedmont police participated in the investigation. Lieutenant David Dothard and Sergeant L. P. Wetzel of the ABI were involved, as were members of the Calhoun County and Cherokee County sheriffs' offices. The entire investigation effort, which was defined as a "multi-agency investigation and cooperative effort," was generally directed by District Attorney Robert

25

Fields. (Rule 20 Tr., Vol. 3 at C-149).

Among the numerous investigative "leads" received by Piedmont Detective Sergeant Brown was a tip that on January 24, 1983, the night Rhonda Hardin was raped and murdered, Carter Doss and Jimmy Isaacs had attempted to lure two young girls into a van for the purposes of engaging in sexual relations. (Trial Tr., Vol. 3 at C-27-28). An informant told Investigator Brown that the day following the discovery of Rhonda's body, Carter Doss had scrubbed out the interior of his van. *Id.* Brown was told that Doss had attempted to pick up young girls on other occasions and was capable of murder. *Id.* This information made Doss and Isaacs suspects. The report concerning Carter Doss and Jimmy Isaacs was provided to Bradley's attorneys.

Within three days after Rhonda Hardin's body was found, Glenn "Coffee" Burns appeared at the Piedmont Police Department and spoke directly with Chief David Amberson. (Trial Tr., Vol. 3 at 470). Burns said that the night before, he had been drinking with Ricky McBrayer and that McBrayer had implicated himself in Rhonda's murder. (Rule 20 Tr., Vol. 1 at 80-81). According to Burns, he had been in the Past Time Lounge drinking from 1:00 p.m. until he met McBrayer at 8:00 or 9:00 that night. (Trial Tr., Vol. 3 at 474). Burns claimed that he and McBrayer had left the bar in Burns's car. (Rule 20 Tr., Vol. 1 at 81). While Burns drove, the men had continued to drink. Burns claimed that McBrayer said, "I hate to say this, but I killed that little ole girl, but I didn't mean to. I just squoze [sic] too hard." *Id.* Burns told Amberson that he had driven back to the Past Time Lounge and, once there, he had told two or three other patrons of the bar what McBrayer was alleged to have said. (*Id.*) After talking with Burns, Chief Amberson immediately instructed ABI Lieutenant Dothard and Piedmont Detective Sergeant Brown to "dig into it." (Trial Tr., Vol. 3 at 478-79). Neither Brown nor Dothard made any note

of their instructions from Amberson. Amberson did not place any written record of his conversation with Burns into the investigative file. (*Id*. at 479). When the investigative files were sent to District Attorney Robert Fields there was no written record which would have identified Burns as the person who had claimed that McBrayer had stated that he had killed "that little girl." (*Id*. at 479-80).

Detective Brown testified that in May of 1983 Danny Smith, the District Attorney's investigator in another county, had received a note indicating that a man named Ricky Maxwell had killed Rhonda Hardin. (Rule 20 Tr., Vol. 2, Brown Dep. at 13-14). On May 12, 1983, Brown drove to Cherokee County and obtained the note from Smith. (*Id*. at 14). ABI Agent David Dothard testified that ABI Agent Sergeant Wetzel was assigned to investigate. (*Id*. at 241). On May 16, 1983, Wetzel interviewed Anita Kay Beecham, the woman who had written the note. (Rule 20 Tr., Vol. 3 at C-203). The interview took place in Cedartown, Georgia. (*Id*.). Mrs. Beecham stated that she had been living with Ricky McBrayer. (*Id*) She told Wetzel that McBrayer had beaten her and that she had reported the beating to Cherokee County, Alabama, sheriff's deputies. (*Id*.). The report of the assault was received by sheriff's deputies in a rural store. (*Id*.). During the interview concerning the assault, Beecham passed a note to Mrs. James, the store owner's wife. (*Id*.). The note read:

> Ricky Maxwell killed Rhonda
> Piedmont, AL

(Rule 20 Tr., Vol. 2 at C-102).

Ms. Beecham told Sergeant Wetzel that Maxwell had known Danny Joe Bradley and that following the murder Maxwell had told her that he "hid out for a while." (Rule 20 Tr., Vol. 3 at

27

C-203). Wetzel reported that Ms. Beecham "could give no specific details of the murder or what lead [sic] her to believe Maxwell could be responsible other than her intuition." *Id.* ABI Lieutenant Dothard testified that the note from Ms. Beecham was not enough to make Ricky Maxwell a suspect; however, Maxwell was investigated and no evidence was ever found to connect him to Rhonda's death. Detective Sergeant Brown testified that it had been established that Ricky Maxwell was "somewhere else at the date of the crime . . . [perhaps] in jail in Cherokee County." (Rule 20 Tr., Vol. 2, Brown Dep. at 16). The note received from Investigator Smith by Brown and Brown's own note acknowledging receipt of the paper from Smith were not provided to Bradley's lawyers.

In the course of his investigation Detective Sergeant Brown received, among numerous other tips, an anonymous telephone call in February of 1983. (*Id.* at 9). The young woman who called Brown said that she had been engaged in an "intimate relationship" with a man named Keith Sanford. (*Id.*). She said that at a point in the progression of the intimacy she changed her mind and attempted to end the intimate encounter. (*Id.*). She said in an apparent attempt to intimidate her into continuing, Keith Sanford had threatened her with a knife and told her that he was responsible for the death of Rhonda Hardin. (*Id.*). He said that he could kill her as well. (*Id.*). Police officers interviewed Sanford on more than one occasion and investigated his alleged involvement but were unable to obtain any evidence which could in any way link Sanford to the murder. (*Id.* at 9-12). While some information concerning Keith Sanford was provided to Bradley's lawyers, Brown's handwritten notes memorializing the anonymous telephone call were not provided.

28

Bradley's attorneys filed a pre-trial motion with the court to require the production of

evidence, specifically including evidence related to Ricky McBrayer. (Trial Tr., Vol. 3 at C-7-

C-9). The motion specifically requested:

> C. Any and all statements taken, notes of statements
> or memorandum of conversations by the state or city
> law enforcement officials with any person that
> indicates or tends to indicate the possible guilt of
> another person.
>
> D. Any and all statements, notes or memorandum of
> conversations taken when any of the following
> names were mentioned as suspects or possible
> suspects: Phillip Manus, Robert Roland, Ricky
> McBryer [sic], Jimmy Isaac, Johnny Bishop, Dianne
> Mobley, Donald Roberts, Keith Sanford, Phillip
> Bass [sic] [Hass], Bill Goodwin, and Charlie
> Grissom.
>
> . . . .
>
> G. Any and all notes or statements of a
> conversation whether in person or by phone with
> Ricky McBryer [sic] concerning the death of
> Rhonda Hardin.

(*Id.*). On April 27, 1983, the circuit court judge entered an order without opposition from the

state which required, among other things, that Bradley's lawyers be provided with

> G. All notes/statements of conversations concerning
> death of victim by Ricky McBryer [sic].
>
> 3. That with regard to the requested items C, E, F,
> J, and K, the state shall furnish to the court its full
> and complete investigative file by April 27, 1983 at
> 4:00 p.m. The court shall then review the state's file
> for the purpose of determining the presence of any
> evidence in any way exculpatory to the defendant.

(Trial Tr., Vol. 3 at C-17-C-19).

The court required the production of all investigative reports, statements and notes of law enforcement officers indicating the possible guilt of another person, and all statements or notes and memorandum related to "possible suspects," including the eleven named in the defendant's discovery motion, for an *in camera* review. (*Id.*). Following the *in camera* review on June 6, 1983, the court directed that six additional items which were designated in the court's order as Exhibits A through F be provided to the attorneys for the defendant as potentially exculpatory. (*Id.* at C-20). The additional material provided information that had been obtained concerning a number of potential "suspects," but did not include any additional information related to Ricky McBrayer, the "Maxwell note" or the "Sanford note."

In the course of investigating Bradley's defense, his attorneys "ran down . . . [as many as] ten names of people that had allegedly talked to McBrayer about [the murder of Rhonda Hardin]." (Rule 20 Tr., Vol. 1 at 110). The attorneys asked these people whether McBrayer had made a statement admitting his involvement in Rhonda's murder. (*Id.*). The attorneys were unable to confirm that McBrayer had ever made such a statement. (*Id.*) The attorneys did not, however, talk with Glenn "Coffee" Burns. (*Id.*). Prior to Bradley's trial, Detective Sergeant Brown met with Bradley's attorneys, Mr. Dick and Mr. Brooks. (Trial Tr., Vol. 3 at 490). Sergeant Brown testified during a hearing on a motion for new trial as follows:

> Q: Did you have occasion to relay to them any information in regard to the alleged confession by Mr. McBrayer?
>
> A: Yes, sir.
>
> Q: And did you tell them the results of the investigation into that particular alleged confession?
>
> A: Yes, sir.

30

Q:     Did you inform them as to the contents that you knew at the time of the alleged confession of Mr. McBrayer?

A:     I shared with them all of the information that I had available pertaining to the statements that he made, that were suppose to have been a confession.

Q:     Alright. And do you have -- did you subsequently obtain any other information in regard to that particular item?

A:     We made a determination that the report made to us was without grounds. It wasn't true.

Q:     And had you made that determination prior to your talking with Mr. Brooks and Mr. Dick.

A:     Oh yes, sir.

Q:     All right. So, what I'm asking you is, did you have any other information that came to you in regard to the alleged confession of Mr. McBrayer after you talked to Mr. Dick and Mr. Brooks?

A:     No, sir.

Q:     All right. Everything that you learned about the alleged confession of Mr. McBrayer, did you give that to Mr. Brooks and Mr. Dick?

A:     I'm not positive that I told them the source or the person that reported to us that Mr. McBrayer had made that statement, but I know that I shared the content of the statement with them and the fact that it had been investigated.

Q:     For the record, who was the source of that particular piece of information?

A:     A gentleman known to me by the name of Coffee Burns.

Q:     Coffee Burns?

A:     Yes, sir.

(*Id.* at 490-91). (emphasis added).

At Bradley's Rule 20 proceeding, District Attorney Robert Field testified that he had received the request for discovery filed by petitioner's attorneys. (Rule 20 Tr., Vol. 1 at 16). Mr. Field stated that it was the policy of his office to inform the investigating agency that a discovery order had been entered and tell the officers to provide any material that was "exculpatory." (*Id.* at 19). While Mr. Field acknowledged that compliance with the due process obligations of *Brady* fell upon the shoulders of the district attorney, it was his belief that the police officers had "a role to play" and were aware of the meaning of the term "exculpatory." (*Id.* at 32). The district attorney acknowledged that the police departments did not necessarily provide to the district attorney all of the investigative notes. (*Id.* at 17).

As previously noted, the Piedmont Police Department, the ABI, the Cherokee County Sheriff's Department, the Anniston Police Department, and the Jackson County Police Department were all part of the multi-agency investigative team. (Rule 20 Tr., Vol. 3, Brown Dep. at 31-32). The investigative files provided to the district attorney were turned over either to Bradley's attorneys or to the court for *in camera* review. Portions of the investigative files provided to the court for *in camera* review were ordered produced to Bradley's lawyers. It is clear from the record that the identity of "Coffee" Burns was not disclosed to Bradley's attorneys through the investigative files or their conversation with Detective Sergeant Brown. It is also clear that the "Ricky Maxwell note" and the "Keith Sanford note" were not in the investigative files provided to the district attorney or to the court. It is undisputed that Bradley's discovery requests were not mere general demands for *Brady* material but clear and specific requests relating directly to Ricky McBrayer by name as well as "all statements taken, notes of statements or memorandum with any person that indicates or tends to indicate the possible guilt of another

32

person."

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83 (1963). A *Brady* violation occurs when:

 (1) The prosecution suppresses evidence;

 (2) The evidence was favorable to the defendant; and

 (3) The evidence was material to the issues at trial.

*United States v. Burroughs,* 830 F.2d 1574, 1577-78 (11th Cir. 1987), *cert. denied,* 485 U.S. 969 (1988). Suppressed evidence is material when there is "a reasonable probability that . . . the result of the proceeding would have been different" had the evidence been available to the defense. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). The *Brady* rule is a derivative of the due process requirements of the Fourteenth Amendment, and as such, prohibits the prosecution from suppressing evidence and is equally applicable to federal and state prosecutions. *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978). The disclosure principles of *Brady* are rooted in the Constitution and not the discovery rules of the Federal Rules of Criminal Procedure. *United States v. Agurs*, 427 U.S. 97, 107 (1976).

*Brady* acknowledges "that the prosecutor's role transcends that of an adversary" because the prosecutor, acting as the representative of the sovereign, has an obligation to ensure "not that it shall win a case, but that justice shall be done." *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985) *(quoting Berger v. United States*, 295 U.S. 78, 88 (1935)). The first element of a *Brady* claim is a requirement that the prosecution must have suppressed or withheld the evidence in

33

question. *Burroughs*, 830 F.2d at 1577-78. The term "suppression" in the *Brady* context does
not require a finding of bad faith or other culpable state of mind on the part of the prosecutor. *Id.*
at 1577. The "prosecution" for *Brady* purposes encompasses not only the individual prosecutor
handling the case, but also extends to the prosecutor's entire office, as well as law enforcement
personnel and other arms of the state involved in the investigative aspects of a particular criminal
venture. Knowledge in the possession of one investigative agency may be imputed to another and
ultimately to the prosecutor consistent with the requirements of *Brady*. *See United States v.
Antone*, 603 F.2d 566, 570 (5th Cir. 1979). "*Brady* and its progeny apply to evidence possessed
by [the] 'prosecution team' which includes both investigative and prosecutorial personnel."
*United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir.), *cert. denied,* 493 U.S. 932 (1989).
Thus, despite the number of investigative agencies, the responsibility for compliance with *Brady*
obligations rested with District Attorney Field.

The Supreme Court has observed further that a "reasonable probability" of a different
result is shown when the non-disclosure "could reasonably be taken to put the whole case in such
a different light as to undermine confidence in the jury's verdict." *Kyles,* 514 U.S. at 435. "[A]
showing of materiality does not require demonstration by a preponderance that the disclosure of
the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.* at 434.
The materiality inquiry is applied to the "suppressed evidence considered collectively, not item-
by-item." *Id.* at 436. Whether a reasonable probability existed that the suppressed evidence
would have changed the outcome is a mixed question of law and fact. *United States v. Barragan*,
793 F.2d 1255 (11th Cir. 1986). For the purposes of the due process analysis, there is no
constitutional distinction between favorable evidence which is in the nature of impeachment

34

information and that which may be properly characterized as factually exculpatory.

On direct appeal of his conviction and sentence, Bradley phrased his argument concerning

the alleged failure to disclosure the identity of "Coffee" Burns in the following manner:

> Although apparently unintentional and not
> malicious, the conduct of the police and district
> attorney in failing to disclose to the defense the
> name of Glenn Burns and to confirm the actuality of
> the confession of McBrayer created a "red herring"
> which prevented the defense from pursuing an
> avenue of investigation which might have turned up
> evidence tending to exculpate the appellant. This
> reasoning is supported by the fact that Sergeant
> Brown only informed the defense counsel of an
> alleged confession, when in fact he knew McBrayer
> did confess, and by the fact that no notes or
> memorandum of the investigation concerning
> McBrayer were turned over to the district attorney.

(Respondent's Exhibit 13, Brief on Appeal at 24-25).

The Alabama Court of Criminal Appeals held that "the exculpatory evidence --

McBrayer's confession -- was disclosed to defense counsel." *Bradley*, 494 So.2d at 768. The

court went on to say "we do not think that the State's duty to disclose McBrayer's confession

included the duty to disclose the person to whom the confession was made." *Id.* The Alabama

Court of Criminal Appeals's decision was affirmed by the Supreme Court of Alabama. *Ex Parte

Bradley*, 494 So.2d 772 (Ala. 1986).

In March of 1988, Bradley filed a petition with the Circuit Court of Calhoun County. He

was represented by attorney Joseph Maloney. In his prayer for relief, Bradley contended:

35

a. McBrayer confessed his crime to Glenn "Coffee" Burns. The fact of McBrayer's confession, although made known to the Petitioner's Attorneys prior to the Petitioner's trial, was rendered useless by the Piedmont Police Department's action in (1) concealing the name of Glenn "Coffee" Burns from the Petitioner's Attorneys, thus not allowing them to further investigate for themselves the accuracy of that confession, and (2) informing the Petitioner's Attorneys that the confession had been investigated and proved groundless, when, in fact, such an investigation had not taken place, was merely cursory, or was otherwise improperly handled.

(Rule 20 Tr., Vol. 2 at C-14).

As part of the pre-hearing discovery in the Rule 20 proceeding, additional investigative notes were provided to Bradley's attorney. It was from these papers that the Maxwell note and the brief memorandum concerning the anonymous telephone call suggesting the involvement of Keith Sanford were discovered. Among the witnesses was Jerry Keith Sanford who confirmed that he had been questioned by investigators concerning the death of Rhonda Hardin. (Rule 20 Tr., Vol. 2 at 251). He testified that he had been at the Past Time Lounge on the night Rhonda Hardin was murdered. (*Id.* at 250). Sanford denied any involvement in the death of Rhonda Hardin. (*Id.* at 249).

Glenn Burns testified, repeating his claim that Ricky McBrayer had admitted his involvement in the death of Rhonda Hardin. (Rule 20 Tr., Vol. 1 at 81-83). Ricky McBrayer testified that on the night of Rhonda Hardin's death he was at the Lamont Hotel with James McFry, Larry Lure, Terry Garmon, Amelia Hass, and Kathy Lloyd. (*Id.* at 71). The group also drove to Georgia before returning to the hotel on the night of the murder. (*Id.*). McBrayer denied ever leaving the Past Time Lounge with Burns in Burns's car. (*Id.* at 72). McBrayer

36

denied killing Rhonda Hardin. (*Id.* at 74). He denied being present when Rhonda Hardin was killed and he denied ever telling Glenn Burns that he had killed Rhonda Hardin. (*Id.*).

Detective Sergeant Brown testified that although the investigators were suspicious of the "validity" of Burns's report because it was common knowledge in the community that there were "hard feelings between Coffee Burns and McBrayer," they pursued the investigative leads regarding McBrayer in an effort to develop evidence that would either place him at the crime scene or persuasively demonstrate that he was somewhere else. (Rule 20 Tr., Vol. 2, Brown Dep. at 19-20). At the hearing, the trial court also admitted the results of a forensic report indicating that Ricky McBrayer had blood type A and was a "secretor." (Rule 20 Tr., Vol. 2 at C-77). These tests were performed after the trial and prior to the Rule 20 hearing. Despite Bradley's claim to the contrary in his brief, this evidence virtually eliminated McBrayer as a suspect. The court concluded:

> Based upon the forensic evidence presented at
> petitioner's capital murder trial, McBrayer would
> have been in the same forensic classification as Gary
> Hardin, Jimmy Isaac, Phillip Manus and Johnny
> Bishop. Consequently, McBrayer would not be a
> likely suspect in the rape/sodomy of Rhonda Hardin.
> Petitioner [Bradley] was tested prior to trial and
> shown to be a non-secretor.

(*Id.*). The circuit court denied relief.

In affirming the denial of Rule 20 relief, the Alabama Court of Criminal Appeals accepted the findings of fact of the circuit court. *See Bradley v. State*, 557 So.2d 1339 (Ala. Crim. App. 1989). The Court also denied relief on each claim holding that the tenets of *Brady v. Maryland* were not violated. *Id.* at 1346. The Court of Criminal Appeals held that Keith Sanford and Ricky

Maxwell were not "suspects in the sense that the investigation actually focused upon them [citing *Jarrell v. Balkcom*, 735 F.2d 1242, 1258 (11th Cir. 1984)]." *Id.* at 1345.

### 1.  **Suppression of Evidence**

In its ruling on Bradley's Rule 20 petition, the circuit court addressed the materiality of the Maxwell note but did not consider the threshold question of its suppression. There is no dispute that Bradley specifically asked for any notes or memoranda of conversation with persons that tended to indicate the possible guilt of another person. (Trial Tr., Vol. 1 at C-7). It is also clear from the court's discovery order that the court specifically requested to review "[the] full and complete investigative file." (*Id.* at C-19). The fact that the court ordered the production of notes in the district attorney's office file which related to suspects other than Ricky Maxwell suggested that had the note been in the file the court would have directed the district attorney to produce the Maxwell note to Bradley's attorneys. The reference to Ricky Maxwell as a potential suspect was evidence either known to the prosecutor or which should have been known to the prosecutor and of which the defense attorney was unaware. *Ogden v. Wolff*, 522 F.2d 816 (8th Cir. 1975). Thus, the evidence was suppressed.

In the case of the "Sanford confession" the Alabama Court of Criminal Appeals reviewed the denial of the Rule 20 petition, again addressing only the question of materiality of the evidence. *Bradley*, 557 So.2d at 1343. It appears undisputed that the investigator was aware that Jerry Keith Sanford was a possible suspect in the murder of Rhonda Hardin and did not disclose the contents of the note from the anonymous caller despite a request which unequivocally encompassed a demand for such material. The evidence was suppressed by the state as that term is applied under *Brady* doctrine.

38

The record is clear that Bradley's lawyers did not ask Detective Sergeant Brown the simple question "to whom did McBrayer make the statement that he was implicated in the murder?". Perhaps they did not do so because Brown told them than McBrayer had not "confessed" to Chief Amberson as they had heard and they were satisfied that the reports they had heard had been investigated. In any case, because the McBrayer confession is not material, it will be assumed that the identity of Burns was suppressed.

## 2. Materiality

Bradley first argues that because the court ordered the production of material which would have included the McBrayer, Sanford and Maxwell information, the materiality of the "evidence" is, in his words, "evident." Bradley premises this claim at least in part upon his contention that "Police Chief David Amberson had a friendship with McBrayer that went beyond the usual citizen/police relationship." (Petition at 33). Indeed, in the Rule 20 proceeding, Bradley attempted to establish that Amberson harbored a motive to avoid arresting McBrayer. No evidence was offered to support this claim. First, it was alleged that Amberson at some point had purchased drugs from McBrayer. The record is absolutely devoid of any evidence that such transactions ever occurred. Amberson testified that he had known Ricky McBrayer for fifteen years. (Rule 20 Tr., Vol. 1 at 49). Amberson testified that he had arrested McBrayer on a number of occasions. (*Id.*) Amberson unequivocally stated that if he had reason to arrest McBrayer for the murder of Rhonda Hardin he would have done so. (*Id.* at 54-55). Amberson was asked whether he had ever purchased illegal drugs from McBrayer. (*Id.* at 50). He specifically denied ever having done so. (*Id.*). Bradley produced the testimony of Lisha McBrayer, the wife of Ricky McBrayer, in an attempt to suggest an illicit relationship between

39

Amberson and McBrayer. (*Id.* at 87). Mrs. McBrayer stated that she had never seen Ricky

McBrayer supply Amberson with drugs. (*Id.*). Mrs. McBrayer testified that she, like others in

her community, had merely heard rumors of a relationship between McBrayer and Amberson.

(*Id.*). McBrayer testified that he considered David Amberson a friend; however, he stated that

Amberson was a friend who had arrested him several times. (*Id.* at 74).

In his petition, Bradley asserts that Detective Sergeant Brown's testimony supported his

claim of the "unusual relationship." Detective Sergeant Brown testified as follows:

> Q: Do you know of any relationship between Chief Amberson and Ricky
> Amberson outside of the normal police and citizen relationship?
>
> A: It has come to my attention that Amberson and McBrayer enjoyed a – a
> measure of friendship outside the police chief /citizen relationship, but to
> what extent that relationship -- that friendship relationship went, I don't
> know.

(Rule 20 Tr., Vol. 3, Brown Dep. at 25). Bradley, however, ignores the next question and answer

which reads:

> Q: Alright. Do you have any reason to believe that the relationship between
> Chief Amberson and Ricky McBrayer affected, either hindered or
> otherwise, the investigation of this case.
>
> A: No, sir, I do not.

(*Id.*). Bradley has not produced any evidence that Chief Amberson suppressed or even had a

motive to suppress McBrayer's involvement in the murder of Rhonda Hardin.[2/] In any event, the

relationship is wholly irrelevant to the due process analysis.

---

[2/] As a factual matter, if the chief had wished to suppress McBrayer's "confession" allegedly made to Glenn
Burns, he could simply have kept the matter to himself rather than directing that it be investigated by his
officers and by officers of the Alabama Bureau of Investigation.

40

Bradley offers a second ground for his assertion that the materiality of the information not produced is "self-evident." He states quite correctly that "when the verdict 'is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.'" (Petition at 43)(*quoting United States v. Agurs*, 427 U.S. 97, 112-113). Bradley has not, however, despite claims made in this petition, offered any evidence in any forum that his conviction was of otherwise "questionable validity." The case against Danny Joe Bradley was largely circumstantial. The fact that his conviction was grounded upon circumstantial evidence does not warrant the conclusion that the jury verdict was of "questionable validity." The legal standard of review for sufficiency of the evidence is the same in both federal and state courts and is the same whether the evidence at issue is direct or circumstantial. *Glasser v. United States*, 315 U.S. 60 (1942); *United States v. Warner*, 441 F.2d 821, 825 (5th Cir.), *cert. denied*, 404 U.S. 829 (1971).

The law is clear that a new trial should not be granted simply because a prosecutor has failed to disclose evidence which the trial court ordered produced without a consideration of the materiality of the evidence and the effect of the evidence on the outcome of the defendant's trial. *Brady*, 373 U.S. at 87. "The principle of *Mooney v. Holohan* [294 U.S. 103 (1935)], is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Id.* The prosecutor's failure to disclose evidence which was the subject of an order of the court does not render moot an examination of the materiality of the evidence itself. *See Spence v. Johnson*, 80 F.3d 989, 999 (5th Cir. 1996)("Spence highlights reports made by the police by two witnesses to whom Harper allegedly bragged about killing someone, but the reports furnished no other 'evidence' of Harper's involvement. In short, had Spence been given these

41

police records and presented his theory regarding Harper at his trial, the State could have countered with facts exonerating Harper. Thus, nondisclosure of the Tab Harper reports does not undermine confidence in the jury's verdict; the information is not material.")

Bradley offers no rationale for his second general premise that his conviction was in some manner "of questionable validity." None of the information which Bradley has characterized as "evidence" in any way directly or indirectly undermines the reliability of the evidence which led to his conviction. That is to say, the evidence of other suspects in no way undermines the reliability or believability of the evidence actually used to convict Bradley.

Bradley's reliance upon *United States v. Burroughs*, 830 F.2d 1574 (11th Cir. 1987), is misplaced. In *Burroughs*, the linchpin of the government's case was the testimony of a co-conspirator named Dennis. The government did not disclose to the defense that Dennis's wife had been granted immunity from prosecution. Dennis and his wife had also been threatened with the prospect of having their children placed into the custody of the state. Because Dennis "was the government's star witness . . . his credibility was the 'critical issue before the jury at trial.'" *Burroughs*, 830 F.2d at 1577. The evidence withheld in *Burroughs* would have had a direct and immediate impact upon the reliability of the evidence considered by the jury relative to Burroughs's guilt. The informant could have been impeached with this information. In contrast, even if the information now characterized by Bradley as "evidence" had been admitted at trial, such evidence would not relate in any way to the reliability of the evidence which the government introduced to establish Bradley's guilt.

Bradley also cited *Kyles v. Whitley*, 514 U.S. 419 (1995) in support of his contention that the withheld evidence was material. In *Kyles*, the "heart of the state's case was eyewitness

42

testimony from people who were at the scene" of a murder in a grocery store parking lot. *Kyles*, 514 U.S. at 429. After the murder, a confidential informant known as "Beanie" telephoned the police using a false name. "Beanie" told police that he had purchased the victim's car, which had been stolen the day of the murder, from a friend named Curtis Kyles. "Beanie" directed the police to Kyles's home to recover evidence including a pistol which he could have placed there himself.

Among the evidence withheld from Kyles's defense attorneys were the contemporaneous eyewitness statements which were markedly inconsistent with their in-court identification of Curtis Kyles. The suppressed witness statements, according to the Supreme Court, actually contained descriptions far more closely resembling the government's informant, "Beanie." Other statements which were withheld from Kyles's attorneys included reports that were factually inconsistent with the eyewitness's testimony at trial concerning the sequence of events at the time of the murder. "Beanie's" own inconsistent statements were not disclosed nor the fact that "Beanie" fit the description of witnesses himself and had sufficient opportunity to plant the physical evidence discovered and used against Kyles. All of the non-disclosed material in *Kyles* would have undermined directly the reliability of the evidence which was used against Kyles. That is, the inconsistent statements of witnesses could have been used to impeach those witnesses' testimony, and proof that "Beanie" planted or could have planted the physical evidence against Kyles could have been used to challenge the reliability of the search evidence. "Beanie's" own inconsistent statements could have been used to prove that his information was unreliable in addition to the fact that he was himself a suspect. In Bradley's case, however, none of the information which is alleged to have been withheld in any way affects the reliability of the evidence used against him at trial.

Bradley also cites *Bowen v. Maynard*, 799 F.2d 593 (10th Cir. 1986), in support of his position that in virtually every case the disclosure of "former suspects or eliminated suspects" must be made in order to avoid a due process violation. *Bowen's* facts render its reach far more modest. In *Bowen* the police investigated a triple murder. A police officer investigating the case possessed substantial evidence that a known out-of-state hit man named Lee Crowe had a motive to have murdered one of the three victims. Crowe, a former South Carolina police officer, was known to the police in the jurisdiction of the murder to have used rare and expensive silver tipped ammunition for a .45 caliber pistol. This same type of rare and expensive ammunition was used in the murder. The state's case against the petitioner Bowen consisted principally of the testimony of two eye witnesses who had picked Bowen from a photo spread as well as a live lineup. It is significant that the district court and the Tenth Circuit Court of Appeals each found the identification procedures by which Bowen had been identified as the murderer were the subject of a number of "frailties." For example, Bowen, who usually wore horned-rimmed glasses, was shown without his glasses. Lee Crowe's photograph was shown to the witnesses, but in a separate photo spread which did not include Bowen. Crowe was also shown with a mustache although there was substantial evidence that Crowe had shaved his mustache during the time frame in which the murders occurred. The live lineup from which Bowen was identified did not include Crowe. In addition, Bowen had produced twelve alibi witnesses. It was against this factual backdrop that the Tenth Circuit found that the decision to stop investigating Crowe did not relieve the prosecution from the burden of disclosing Crowe's identity because of the strong

44

objective evidence that Crowe was indeed the killer. *Bowen*, 799 F.2d at 612-14.

Bradley suggests nothing similar in his own claim. In *Bowen*, substantial objective evidence of Crowe's involvement went far beyond the uncorroborated hearsay statements which allegedly implicated McBrayer, Sanford, or Maxwell. Crowe used the same rare type of ammunition and caliber of pistol used to murder three victims. Crowe physically resembled the shooter. The evidence withheld went directly to the reliability of the eyewitness's testimony. *Bowen* is inapposite to Bradley's claim.

Bradley also contends that *Lindsey v. King*, 769 F.2d 1034 (5th Cir. 1985), supports his claim. In *Lindsey* a woman was shot in a parking lot. A witness, named Alexander, heard screams and saw people chasing the gunman. Alexander was later interviewed by police. The police officer who took Alexander's statement wrote that Alexander had not seen the face of the perpetrator and that it would be useless to show him photographs. When Tyrone Lindsey was charged with the murder, the sister of the victim placed reward notices in the newspaper and later spoke with Mr. Alexander. Photographs of Lindsey appeared on television. Alexander was interviewed again by a police officer and this time positively identified Tyrone Lindsey as the perpetrator. A motion was filed specifically requesting copies of Alexander's statements. The state produced copies of the statement in which Alexander purported to identify Lindsey but did not produce the statement made to police in which Alexander admitted he had not seen the face of the perpetrator.

At trial, the state called Alexander as a witness. Contrary to his initial statement that he had not seen the perpetrator's face, Alexander identified Tyrone Lindsey as the killer. As in the

45

case of *Kyles*, the Alexander statement was material to the testimony offered by Alexander. The Alexander testimony was particularly critical because a second suspect stated that he had been present at the scene and that Lindsey was the murderer. The second suspect and Lindsey physically resembled each other. The Fifth Circuit Court of Appeals found that the prosecutor "deliberately crippled cross-examination of a critical witness on the only serious issue in the case-- identification . . . [of] two suspects nearly identical in physical appearance. . . ." *Lindsey*, 769 F.2d at 1040. There is simply nothing in *Lindsey* which in any way supports Bradley's contention that the violation of a discovery order obviates the necessity of determining the materiality of the evidence at issue.

Bradley's third argument is premised upon the unremarkable conclusion that "a reviewing court may consider directly any adverse affect that prosecution's failure to respond [to a *Brady* request] might have had on the preparation and presentation of the defendant's case." (Petition at 43). In support of this argument Bradley cited *Bagley, supra, Burroughs, supra,* and *United States v. Spagnoulo*, 960 F.2d 990 (11th Cir. 1992). *Bagley* is clearly an impeachment evidence case in which the material withheld related directly to the credibility of the primary witness against the defendant and is thus wholly inapplicable here. The same is true of *Burroughs* for the reasons addressed above.

In *Spagnoulo*, the defendant was charged with attempted murder in a drug conspiracy case. While in pretrial detention he was also charged with an assault on a fellow inmate. After the inmate assault charge was filed, Spagnoulo was examined by a psychologist and a psychiatrist.

46

Each concluded that Spagnoulo was paranoid and delusional. Based upon the report of Spagnoulo's mental problems, the government dismissed the assault case. The indictment which had led to Spagnoulo's pretrial detention, however, remained active. The report of Spagnoulo's mental condition was known to the prosecutor assigned to the assault charge but was not provided to the defense attorney in the underlying attempted murder and drug case. The district court in the underlying case had held numerous hearings to determine whether Spagnoulo was competent to stand trial.

The Eleventh Circuit noted that the defense of insanity in the underlying case was an option which could not have been adequately investigated without access to the psychologist's report which had been received by the prosecution in the assault case. *Spagnoulo*, 960 F.2d at 993. The evidence withheld directly related to proof of a cognizable affirmative defense which was not actively considered in the pretrial strategy in the underlying case because the defense attorneys did not have the report which was in the possession of the prosecutors. In contrast, Bradley was not denied any viable defenses based on the failure of the prosecution to properly follow the court's discovery order.

Unlike the circumstances of the cases in which he cites, the evidence withheld from Bradley neither strongly suggests the likelihood of another perpetrator, nor provides information relevant to an affirmative defense. The other suspects information does not in any way affect the quantum of proof nor the reliability of proof offered against Bradley. Thus, the information suppressed by the prosecution was irrelevant to Bradley's defense.

47

### 3.   Admissibility

None of the three items of material allegedly withheld from Bradley would have been

admissible at Bradley's trial for any purpose. The identity of Glenn "Coffee" Burns was not

disclosed. If it had been and Bradley's lawyers had been able to get Burns to agree to testify at

trial, his rendition of McBrayer's "confession" was and remains inadmissible under Alabama law.

The Alabama rule is clear and longstanding:

> Where there is evidence tending to connect another
> with the commission of a crime with which the
> prisoner is charged, and the evidence adduced
> against the prisoner is circumstantial, the defendant
> may adduce any legal evidence tending to fix guilt of
> the offense on another and to show motive on that
> other's part to commit the offense.

*Spicer v. State*, 73 So. 396, 398 (Ala. 1916). "[B]ut it is settled that this cannot be shown by the

admissions or confessions of a third person, not under oath; such testimony being hearsay." *Wells*

*v. State*, 107 So. 31 (Ala. 1926), citing *Owensby v. State*, 2 So. 764 (Ala. 1887).

Bradley's conviction was based largely upon circumstantial evidence which would have

permitted him to introduce competent evidence tending to fix guilt on another. The Alabama

courts, however, have adhered strictly to the requirement that such evidence be legally admissible.

Immediately prior to Bradley's trial, the Alabama courts reaffirmed this rule. In *Law v. State*, 407

So.2d 572, 575-76 (Ala. Crim. App. 1981), the appellate court wrote, in the context of a motion

for new trial:

In an amendment to the motion for new trial,
defendant alleged that there was newly discovered
material evidence, which was set forth in an affidavit
of Glenda Portice, in pertinent part as follows:

"Affiant shows that after all the evidence had been
received in the trial of the above case and after the
jury had returned to the courtroom and announced
that it found the defendant guilty as charged, she
was told by Sam Henley that he was responsible for
the crime for which the defendant was found
guilty . . ."

The affiant testified on the hearing of the motion for
a new trial. She said that the exact words of Sam
Henley were "I'm the one who beat Linda Rogers
whorish a-." Appellant says in his brief that such
testimony constitutes evidence "that another
individual had made the statement that he committed
the crime of which the appellant stands convicted."
. . . The particular evidence would not have been
admissible on the trial of the case and would not be
admissible on any retrial thereof, for the reason that
it constitutes hearsay.

"The proposed testimony of the witness, Warren Lancaster,
to the effect, or which would have tended to show, that one
Lee Lancaster had admitted or confessed to the witness that
he, Lee Lancaster, killed Will Welch, for whose murder the
defendant was being tried, was the merest hearsay, wholly
irrelevant and incompetent and the court properly excluded
it from the jury." (citations omitted).

It has been correctly reasoned since *Welsh v. State,
supra*, that such evidence would be inadmissible on
any retrial and it would not furnish the basis of
granting a motion for new trial.

Alabama has clearly applied this longstanding rule in capital cases both before and after

Bradley's conviction. For example, in *Johnson v. State*, 612 So.2d 1288 (Ala. Crim. App.

49

1992), *cert. denied* (Feb. 19, 1993), the Alabama Court of Criminals Appeals wrote:

> Finally, even if, arguendo, the "other suspects"
> information had been favorable to Johnson and even
> if, arguendo, the defense had not known of this
> information prior to trial, the "other suspects"
> information is still not material to the issues at trial.
> The evidence is material only if there is a reasonable
> probability that had the evidence been disclosed to
> the defense, the results of the proceeding would
> have been different . . . In *Hendrix v. State*, 589
> So.2d 769 (Ala. Cr. App. 1991), we held that even if
> the prosecution had suppressed evidence concerning
> six other suspects, the defendant would not have
> been entitled to any relief because there was no
> reasonable probability that if the evidence of the
> other suspects had been disclosed the results of the
> proceeding would have been different. Under
> Alabama law, moreover, "other suspect" information
> is not admissible. "It is recognized that an accused
> is not entitled to prove, without more, that another
> has been suspected of committing the crime for
> which the accused is being tried." *C. Gamble,
> McElroy's Alabama Evidence* § 48.01(9) (4th Ed.
> 1991). Most recently in *Tomlin v. State*, 591 So. 2d
> 550, 558 (Ala. Crim. App. 1991), this court stated
> that "[t]he general rule in Alabama is that an accused
> is not entitled to introduce testimony that someone
> else was suspected of committing the crime for
> which he was tried." Applying these principles to
> this case, there is no reasonable probability that, had
> the ABI and reports in police files been disclosed to
> the defense, the result of the proceedings would
> have been different. Johnson has not established
> that anything in the ABI report or police files
> concerning "other suspects" would have been
> admissible at trial.

*Johnson*, 612 So.2d at 1293 (emphasis added).

That such evidentiary restrictions are constitutional is undeniable. Georgia, for example,

has a substantially similar rule. *See Timberlake v. State*, 271 S.E. 2d 792, 796 (Ga. 1980)

50

(reaffirming in the context of a *Brady* claim the "long-standing rule in [Georgia] that declarations to third persons against the declarant's penal interest, to the effect that the declarant, and not the accused, was the actual perpetrator of the offense, are not admissible in favor of the accused at his trial"). Indeed, the Eleventh Circuit Court of Appeals has specifically considered the admissibility of evidence in assessing a *Brady* claim. In a case applying the more rigid test for the materiality of *Brady* under the provisions of 28 U.S.C. § 2244(b)(3)(A), the Eleventh Circuit wrote:

> Thus, we move on to the final step of our analysis and determine whether the fact finder at Boshears' trial clearly would have found him not guilty if Boshears had known of the police report at the time of his trial. . . . We begin with Dr. Morris' statement quoted in the police report. We first note that because he did not make the statement while testifying in Boshears' trial, the statement is inadmissible as hearsay. *See* Federal Rule of Evidence 801, 802. <u>Because this statement would have been inadmissible at trial, the fact finder would not have had the opportunity to consider it.</u>

*In re Boshears*, 110 F.3d 1538, 1542 (11th Cir. 1997) (emphasis added). *Boshears* is not cited here for the purpose of assessing a *Brady* claim and certainly it is not suggested that Bradley is required to prove that he would have been adjudicated not guilty. It is significant, however, that the Eleventh Circuit Court of Appeals has recognized that the *admissibility* of evidence is a component in the proper assessment of the materiality of information subject to a *Brady* claim.

Bradley's own attorneys recognized that the evidence was not necessarily exculpatory or admissible. For example, with regard to the "Ricky Maxwell note," Ralph Brooks, Bradley's senior attorney, testified as follows:

51

> Q:    Again, as to petitioner's Exhibit No. 3 relating to that note from Danny
>        Smith, paper note, reading "Ricky Maxwell killed Rhonda," likewise, if you
>        had been presented with this evidence, with the statement that this note
>        was an anonymous note received by the Sheriff of Cherokee County,
>        would you have presented that as evidence in Danny Bradley's trial?
>
> A.    Not unless I could find who it came from and some witness to put it on
>        with. I couldn't have put on an anonymous phone call.

(Rule 20 Tr., Vol. 1 at 125). In response to the note concerning Keith Sanford, Mr. Brooks

testified:

> Q.    . . . If you had been provided with the information about Keith Sanford that
>        said, "We killed Rhonda and I'll kill you," something to that effect, with
>        the police officers telling you that they checked that out and there was no
>        substance to that statement, would you have presented that evidence at
>        trial?
>
> A.    I don't think I could have presented it, I wouldn't have had anything to
>        collaborate [sic] it with or any basis to put it on.

(*Id.* at 124-25). Indeed, in response to questions by Bradley's Rule 20 attorney, Mr. Brooks

expressed skepticism as to whether the exhibits concerning Sanford and Maxwell were even

exculpatory:

> Q.    Were you informed of any such information prior to trial?
>
> A.    No sir.
>
> Q.    Do you have an opinion as to whether or not that's exculpatory to the
>        defendant?
>
> A.    That would--is hard to answer. You're talking about this alone?
>
> Q.    Would that tend to exculpate the defendant?

> A.     Only if it could be verified in some way. I mean, if it's an anonymous call
>        that cannot be traced, I don't know what--I would have tried, but I don't
>        know what I would have done with it unless they could have given me
>        some idea who made this particular phone call or who the statement was
>        made to, or--I mean—

(*Id.* at 112). While Bradley's second attorney, Mr. Thomas Dick, testified that they would have

"used" the evidence, he conceded the evidentiary limitations:

> Q.     Now, Mr. Maloney asked you about exhibits--defendant's/petitioner's
>        exhibits 1 and 3. Let me ask you about whether you view them to be
>        exculpatory and, if so, if you would have presented them at trial. As to
>        Exhibit Number 1, related to Keith Sanford, the statement, "we killed
>        Rhonda" if the police department had presented this to you as an allegation
>        that they checked out and found there was no merit to this allegation,
>        would you have been able to present this as evidence at trial?
>
> A.     You're asking if I could have introduced this piece of paper in trial?
>
> Q.     Or the statement, if it were available at some point in that form, or had Mr.
>        Brown said that, "there was a statement we received to this effect" along
>        with the—
>
> A.     I assume it could have come out in cross-examination. You know, I can't
>        tell you how we'd try to use it because we didn't have it. But I assume we
>        could cross-examine it. [sic]
>
> Q.     You could have used it in impeachment?
>
> A.     True, correct, right.
>
> Q.     Again, let me ask you—
>
> A.     And in any other way that would could have hoped to have gotten it in. . . .

(*Id.* at 156).

> Q.     I asked you hypothetically if you had been presented with this information
>        prior to trial [the Ricky Maxwell note] and a law enforcement official had
>        told you that this was received anonymously by the Cherokee County
>        Sheriff's Office would you have been able to utilize this as substantive
>        evidence in Mr. Bradley's trial?

A.     We certainly would have tried. That's about the only way I can answer it. Making an evidentiary ruling on just that, I don't know. But hopefully we would have gotten a little more and that certainly would have been admissible, or for cross-examination or impeachment purposes. We would have used all our best efforts to get it in.

Q.     Okay.

A.     As far as--I can't rule on status of the evidence.

(*Id.* at 157-58). It is apparent that even after the trial and after an opportunity to review the evidence itself, neither of Bradley's attorneys could formulate a theory under which the evidence would be admissible.

### 4.     Investigation by the Defendant

As addressed above in *Spagnoulo*, evidence which is withheld contrary to a discovery order need not be admissible if the information would have provided an opportunity to develop additional evidence or a different defense. There is no evidence in the record that Bradley's attorneys would have investigated the alleged involvement of any other defendant. For example, Bradley's lawyers knew of the information concerning Carter Doss and Jimmy Isaac and their attempts to lure young women into their van on January 24, 1983. There was no suggestion at any proceeding indicating that any attempt was made to investigate this "alternative suspect" defense. If, however, it is assumed that such investigation would have been conducted as to McBrayer, Maxwell and Sanford, there is no evidence of any kind to suggest that the investigation by Bradley would have produced any results different from those of the police.

Contrary to his assertion in his Rule 20 petition, Bradley offered no evidence that the investigation of Ricky McBrayer was "cursory." Investigation by Bradley's attorneys would have

54

revealed that McBrayer was at a motel in the Piedmont area until he traveled to Georgia. He was in the company of three or more persons throughout the entire evening of January 24th. Ultimately, the blood and saliva analysis of McBrayer indicated that he has type A blood and is a secretor which would have virtually eliminated him as the murderer. Bradley's attorneys would have discovered, as did the police, that there was "bad blood" between Glenn "Coffee" Burns and Ricky McBrayer indicating a substantial motive for Burns to fabricate McBrayer's "alleged" confession.

There is nothing in the record to suggest that Bradley's "investigation" would have produced any additional information with regard to Ricky Maxwell. Bradley has produced no evidence that the conclusion that Ricky Maxwell was elsewhere, possibly in jail, at the time of the commission of the murder was erroneous.

Finally, nothing in the record suggests that any additional investigation was possible with respect to Keith Sanford. Detective Sergeant Brown did not know the name of the woman from whom he received the telephone call. Sanford denied his involvement and provided an alibi, contending that he was at the Past Time Lounge. Despite his conclusion that Sanford was not "cooperative" during the investigation, Brown was unable to find any evidence of any kind to link Sanford to the death of Rhonda Hardin.

The "evidence" in this case with respect to McBrayer, Sanford and Maxwell consisted solely of uncorroborated, unsubstantiated representations from third parties. Indeed, Bradley's own lawyers had been unable to find anyone who could have corroborated Burns's claim that McBrayer had confessed despite the fact that Burns claimed to have told a number of people. Unlike *Bowen*, there was no substantial evidence linking "another suspect" to the death of Rhonda

55

Hardin. Nothing prevented Bradley's attorneys from investigating Ricky McBrayer and Keith Sanford prior to trial. In the post-conviction proceeding, neither of Bradley's attorneys could articulate any additional effort which could have been undertaken had the non-disclosed information been provided. There is no reason to conclude any different result could have come from the disclosure of this material.

## 5. Impeachment

There is no question that *Brady* and its progeny require the production of material useful to the defendant in impeachment of witnesses against him. In Bradley's case, the impeachment could have been directed only to the investigation and only then through the officers providing the evidence. Unlike *Kyles*, *Bowen* and *Lindsey* cited by Bradley, the evidence which was not produced could not have been used to impeach any particular piece of evidence actually used in obtaining his conviction.

Bradley has failed to establish that his due process rights as outlined in *Brady v. Maryland* have been violated. He has also failed to demonstrate that the evidence withheld was material to any issue at trial. Unlike *Kyles*, there is simply nothing before this court concerning McBrayer, Maxwell, or Sanford which would support a conclusion that taken together this information undermines confidence in the jury's verdict. Bradley is not entitled to relief on his claim.

## C. *Jackson v. Virginia* Claim: Murder During the Commission of a Rape

In his petition Bradley contends that the evidence was insufficient to sustain the jury's finding that Rhonda Hardin was murdered "during the commission" of a rape, citing *Jackson v. Virginia*, 443 U.S. 307 (1979). In *Jackson*, the Supreme Court stated that a § 2254 petitioner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no

56

rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324.

(emphasis added)  The record evidence must be reviewed "in the  light most favorable to the

prosecution." *Id.* at 319.  The habeas corpus court must make "explicit reference to the

substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.  The statute

under which Bradley was convicted, *Alabama Code* § 13A-5-40(a)(3), reads as follows:

> Murder by the defendant during a
> rape in the first or second degree or
> in an attempt thereof committed by
> the defendant; or murder by the
> defendant during sodomy in the first
> or second degree or an attempt
> thereof committed by the defendant;
> [is a capital offense].

The statute further defines the term "during" in § 13A-5-39(2) as:

> The term as used in this section,
> 13A-5-40(a), means in the course of
> or in connection with the commission
> of, or in immediate flight from the
> commission of the underlying felony
> or attempt thereof.

In considering Bradley's claim on appeal, the Alabama Court of Criminal Appeals wrote:

> Our review of the record convinces this Court that
> the evidence, although totally circumstantial, was
> sufficient to prove that Rhonda Hardin was
> murdered during the commission of a rape and
> sodomy. . . . From the expert testimony presented,
> the jury could have properly inferred that Rhonda
> engaged in sexual intercourse and deviant sexual
> intercourse shortly before her death.

*Bradley*, 494 So.2d at 769.

In his § 2254 petition, Bradley asserts that "[w]ith due respect to the appellate court, that conclusion [that Rhonda engaged in sexual intercourse and deviant sexual intercourse shortly before her death] is totally without foundation." (Petition at 47). Bradley goes on to assert that "[t]here is not a single shred of evidence in the trial record from which the jury could have derived the inference attributed to it by the Court of Criminal Appeals, for the simple reason that there was neither testimonial nor documentary evidence introduced by the State -- from any source -- which established or purported to establish when the sexual activity in which Rhonda was involved took place." (*Id.*). Bradley argues that the state must first prove the time of the rape and sodomy, then the time of the death before it may discuss Bradley's own actions.

Bradley assumes that because the time of Rhonda's death and the sexual activity were not specifically fixed, there was no "temporal nexus" between Rhonda's murder and the predicate sexual activity. The evidence established that at 9:00 p.m. on January 24th Rhonda's brother, Bubba, went to bed leaving Rhonda alone with Danny Joe Bradley. (Trial Tr., Vol. 1 at 113, 119). Bubba was told not to sleep in the bed usually occupied by the children but to go to his mother's room. (*Id.* at 113.). At approximately midnight he heard the back door open. (*Id.*). At approximately 12:50 p.m. Danny Joe Bradley appeared at the home of Phillip Manus purporting to be distressed at his inability to locate Rhonda. (*Id.* at 130-31). When discovered, Rhonda's body was dressed in a pair of red corduroy pants, a red pullover blouse and a pair of leg warmers. (Trial Tr., Vol. 2 at 220). The clothes on Rhonda's body matched those she wore on the night of January 24th. (Trial Tr., Vol. 1 at 104). Rhonda's shoes, however, were tied in a single knot unlike the manner in which family members testified Rhonda habitually tied her shoes. (Trial Tr., Vol. 2 at 209, 235, 288). Fibers found in the trunk of Bradley's car matched the type and color of

58

the fibers on the pants Rhonda had worn on the night of January 24th and that were on her body when it was found on January 25th. (*Id.* at 224). This evidence indicates that Rhonda was in the trunk of Bradley's car. Stains, including fecal matter and semen, were found on a bed sheet taken from the children's bedroom and on a white blanket sheet which had been on the children's bed. (*Id.* at 267). The fecal matter and semen stains found inside the pants found on the body of Rhonda Hardin were also consistent with a non-secretor's spermatozoa. (*Id.* at 265). These stains were consistent with anal and vaginal intercourse, indicating that Rhonda had been raped and sodomized.

Based upon the *Jackson v. Virginia* standard, there is unquestionably circumstantial proof from which a jury could conclude that Rhonda Hardin did not have sexual intercourse on January 24th prior to 9:00 p.m., that Rhonda Hardin's body was dressed after sexual intercourse and deviant sexual intercourse in her bedroom at Danny Joe Bradley's home, and that the body was then transported in the trunk of Danny Joe Bradley's automobile. Thus, the evidence supports the conclusion that she was murdered in the course of a rape and sodomy.

The second prong of Bradley's attack on the relationship between his conviction and the rape and murder of Rhonda Hardin is his claim that the "undisputed cause of death," that is, the strangulation of Rhonda Hardin, does not establish a "temporal nexus" with the sexual activity. Rhonda's body contained semen in her mouth, stomach, anus and vagina. The presence of semen in the stomach strongly indicates that the twelve-year-old girl was alive when she swallowed or was forced to swallow semen during an act of sodomy as defined by Alabama law. A reasonable jury could find that the victim was strangled to death as a consequence of her rape and sodomy. The jury could infer that Bradley committed these acts in part because he had rendered the child

59

unconscious by squeezing her neck on other occasions as well as the circumstances set out above.

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court 'to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt . . .' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19. Under the *Jackson v. Virginia* standard, Bradley is entitled to no relief.

## D.     Aggravating Circumstances of Rape

Bradley contends that because " there was no evidence in the record sufficient to support a finding beyond a reasonable doubt that the victim was murdered 'during' a rape and/or sodomy, there could be . . . no evidence sufficient to support application of this same consideration as an aggravating circumstance justifying the death penalty." (Petition at 50). *Alabama Code* § 13A-5-40(a)(3) provides that a murder is within the definitional ambit of offenses authorizing capital punishment when committed during the course of a rape or sodomy. Because the state satisfies the *Jackson v. Virginia* standard of evidence, the aggravating circumstance of the commission of a murder in the course of a rape or sodomy is applicable in this case. There is no question that the use of an element of the capital offense as an aggravating circumstance in support of capital punishment is itself constitutional. *See Lowenfield v. Phelps*, 484 U.S. 231, 241-44 (1988). The offense for which Danny Joe Bradley was convicted was properly considered as a murder within the narrow confines of capital offenses and the aggravating factor was itself properly applied.

The mere fact that the jury found that the conduct of Bradley placed the murder of Rhonda Hardin into the narrow classification of offenses which authorize capital punishment did

60

not automatically mean that the death sentence would then be imposed. "[T]he jury could have found [Bradley] guilty of felony murder and yet still not have concluded that the parallel aggravating circumstance justified the imposition of capital punishment; nor need the sentencing judge have agreed with the jury's determination that felony murder had been proven beyond a reasonable doubt." *Bertolotti v. Dugger*, 883 F.2d 1503, 1527-28 (11th Cir. 1989). Bradley is entitled to no relief on this claim.

### E.    *Maynard v. Cartwright* Claim: Especially Heinous or Atrocious

Since *Furman v. Georgia,* 408 U.S. 238 (1972), the Supreme Court has required that a capital sentencer's discretion be challenged and limited so as to minimize the risk of wholly arbitrary and capricious decisions. *See Gregg v. Georgia*, 428 U.S. 153, 188-89 (1976) (plurality opinion). In particular, the Court has held that an overly broad application of a statutory aggravating circumstance is invalid where there is "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980) (invalidating provision allowing death penalty where crime was "outrageously or wantonly vile, horrible, and inhuman," because "[t]here is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." *Id.* at 428.). Accordingly, aggravating circumstances, as construed and applied by the state courts, "must genuinely narrow the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 877 (1983).

Prior to sentencing, Bradley objected to the jurors' consideration of an aggravating circumstance -- that the murder of Rhonda Hardin was especially heinous, atrocious

61

or cruel.[9]  After the objection and prior to the jury deliberation, the court provided the following

instruction:

> The aggravating circumstances which you may
> consider in this case, if you find from the evidence
> that they have been proven beyond a reasonable are
> as follows: That the capital offense was committed
> while a defendant was engaged in the commission
> of, or an attempt to commit, or flight after a rape.
> That the capital offense was especially heinous,
> atrocious, and cruel compared to other capital
> offenses.
>
> Now, the term "heinous" means extremely wicked
> or shockingly evil. The term "atrocious" means
> outrageously wicked and violent. The term "cruel"
> means designed to inflict a high degree of pain with
> other indifference to or even enjoyment of the
> suffering of others.
>
> What is intended to be included in this aggravating
> circumstances is those cases where the actual
> commission of the capital offense is accompanied by
> such additional acts as to set the crime apart from
> the norm of capital offenses.
>
> For a capital offense to be especially heinous or
> atrocious, any brutality which is involved must
> exceed that which is normally present in any capital
> offense. For a capital offense to be especially cruel,
> it must be a conscienceless or pitiless crime which is
> unnecessarily torturous to the victim.
>
> All capital offenses are heinous, atrocious and cruel
> to some extent. What is intended to be covered by
> this aggravating circumstance is only those cases in
> which the degree of heinousness, atrociousness or
> cruelty exceeds that which will always exist when a
> capital offense is committed.

---

[9]  "Second motion, is for this Jury to rely upon the atrocious part of the statute specifically provides that there
is as compared to other capital cases.  And there is no evidence before this Jury by which they can compare
that to a capital case, and therefore there has been no showing of any aggravating circumstance that can be
proved beyond a reasonable doubt.  How can they compare it to other capital cases without evidence of what
other capital cases are?"  (Trial Tr., Vol. 3 at 426).

(Trial Tr., Vol. 3 at 431-432).

After the court's charge, Bradley renewed his objection to the use of the aggravating circumstance of a murder committed during the commission of rape. (*Id.* at 439). He did not renew his objection that the aggravating circumstance of especially heinous or cruel should not be applied. The jury recommended by a vote of twelve to zero that Bradley be sentenced to death. (*Id.* at 440).

On direct appeal, Bradley argued that the trial court committed error in finding that the death of Rhonda Hardin was "especially heinous, atrocious or cruel." (Respondents' Exhibit 13 at 37). In its findings of fact in a sentencing order, the trial court found:

> (a) The capital offense <u>was</u> especially heinous, atrocious, or cruel compared to other capital offenses. The Court makes this finding based upon the interpretation of the aggravating circumstances as made by the Alabama Court of Criminal Appeals and the Supreme Court in defining heinous, atrocious or cruel.

(Trial Tr., Vol. 3 at C-85).

The Alabama Court of Criminal Appeals addressed the aggravating factor of especially heinous, atrocious or cruel in two ways. First, the court specifically affirmed the trial court's finding that the aggravating circumstance was appropriately applied. *Bradley*, 494 So.2d at 770.[9/] Secondly, the Court of Criminal Appeals concluded that it had no difficulty in independently determining that the murder of Rhonda Hardin was especially heinous, atrocious or cruel as

---

[9/]     "The trial court properly found that [t]he capital offense was especially heinous, atrocious or cruel compared to other capital offenses. § 13A-5-49(8). This aggravating circumstance was intended to apply only to those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." *Id.*

compared to other capital offenses. *Id.* at 771. The court noted that it did not consider only the fact that a twelve-year-old child was raped, but observed further that she was "sexually abused and strangled to death." The court noted that "Rhonda was not an adult but a twelve-year-old child. Her assailant was her twenty-two-year-old stepfather. The especially heinous, atrocious or cruel aggravating circumstance was warranted and fully justified in this case." *Id.* The appellate court and the trial court clearly looked to the controlling precedent under Alabama law narrowing the application of the aggravating factor. *Id.* at 770.

Bradley contends that the findings of the trial court and the Court of Criminal Appeals violated the three-tiered analysis for the appropriate application of this aggravating factor set out by the Eleventh Circuit Court of Appeals in *Lindsey v. Thigpen*, 875 F.2d 1509 (11th Cir. 1989). In *Lindsey*, the Court of Appeals for the Eleventh Circuit concluded that (1) appellate courts must have narrowed the meaning of the factor by consistently limiting the application to a relatively narrow class of cases, so that their use informs the sentencer of what it must find to impose the death penalty; (2) the sentencing court must have made either an explicit finding that the crime was "especially heinous, atrocious or cruel" or an explicit finding that the crime exhibited the narrowing characteristics set forth in the state-court decisions interpreting those words; and (3) the sentencer's conclusion that the facts of the case under consideration place the crime within that class of cases defined by the state court's narrowing construction of the term "heinous, atrocious, or cruel" must not have subverted the narrowing function of those words by obscuring the boundaries of those class of cases to which they apply. *Lindsey*, 875 F.2d at 1514.

Bradley contends that the trial court and the Court of Criminal Appeals failed to satisfy the second and third prongs. Bradley argues that the trial judge did not recount any of the facts of the

64

case upon which he relied for his conclusory statement that the capital offense was especially heinous. Bradley then contends that because the judge in *Lindsey* had articulated such facts only then was the reviewing court able to properly analyze the application of the factor. *Lindsey* imposes no such requirement. The specific language of the *Lindsey* "test" is that "the sentencing court must have made *either* an explicit finding that the crime was 'especially heinous, atrocious or cruel' *or* an explicit finding that the crime exhibited the narrowing characteristics set forth in the state-court decisions interpreting those words," which is precisely the finding made by the trial court. *Id.* (emphasis added).

The Court of Criminal Appeals further independently reviewed the application of the factor and concluded that the specific facts which removed Bradley's murder of Rhonda Hardin from the normal course of capital cases included the sexual abuse, including oral and anal sodomy and rape of a twelve-year-old child by her twenty-two-year-old stepfather. Clearly, these findings do not in any way subvert the boundary of the narrowing function of the use of the aggravating circumstance. Bradley would have the aggravating circumstance limited only to earlier statements that a particular fact pattern warranted the application of the aggravating circumstances and unless such a specific fact pattern had been established, the aggravating circumstance could not apply. This is not the law. In finding that the aggravating circumstance was properly applied in Bradley's case, the Court of Criminal Appeals compared the narrowing function of the Alabama statute and the facts of the particular case to the holdings in other jurisdictions in which such conduct was held to be within the narrowed class of capital offenses. Bradley's suggestion that this analysis was somehow improper is erroneous.

65

## III. CONCLUSION

The court concludes that Danny Joe Bradley's Petition for Writ of Habeas Corpus is due

to be denied. An order in accordance with this Memorandum Opinion will be entered

contemporaneously herewith.

DONE this 27th day of January, 1999.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

66